**CHRIS–CRAFT INDUSTRIES, INC.,**
Plaintiff-Appellant,

v.

**PIPER AIRCRAFT CORPORATION,**
Howard Piper, Thomas F. Piper, William T. Piper, Jr., Bangor Punta Corporation, Nicolas M. Salgo, David M. Wallace, The First Boston Corporation, Paul L. Miller and Nicholas H. Bayard, Defendants-Appellees.

**BANGOR PUNTA CORPORATION,**
Plaintiff-Appellant,

v.

**CHRIS-CRAFT INDUSTRIES, INC.,**
Defendant-Appellee.

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant-Appellee,**

v.

**BANGOR PUNTA CORPORATION,**
Defendant-Appellee-Appellant.

Nos. 805–808, Dockets 72–1053, 72–1064, 72–1120, 72–1140.

United States Court of Appeals,
Second Circuit.

Argued Aug. 14, 1972.

Decided March 16, 1973.

Timbers, Circuit Judge, dissented in part in Docket No. 72–1053.

Gurfein, District Judge, filed concurring opinion.

Mansfield, Circuit Judge, filed concurring and dissenting opinion.

In Docket No. 72–1064, on April 25, 1973, petition for rehearing granted in part; petition for rehearing en banc unanimously denied.

In Docket No. 72–1053, on May 8, 1973, petition for rehearing denied, 2–1; petition for rehearing en banc denied, 5–3.

Hays, Oakes and Timbers, Circuit Judges, dissented from denial of petition for rehearing en banc in Docket No. 72–1053.

Arthur L. Liman, New York City (Stuart Robinowitz, Joseph J. Ackell, Jack C. Auspitz, Anthony M. Radice, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for Chris-Craft Industries, Inc. (plaintiff-appellant in No. 72–1064; defendant-appellee in No. 72–1120).

Zachary Shimer, New York City (Paul G. Pennoyer, Jr., Irene C. Warshauer, and Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief), for Piper Aircraft Corp., Howard Piper, Thomas F. Piper, and William T. Piper, Jr. (defendants-appellees in No. 72–1064).

James V. Ryan, New York City (William L. D. Barrett, C. Kenneth Shank, Jr., and Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, on the brief), for Bangor Punta Corp. (defendant-appellee in No. 72–1064; plaintiff-appellant in No. 72–1120; defendant-appellee-appellant in Nos. 72–1053 and 72–1140) and for Nicolas M. Salgo and David W. Wallace (defendant-appellees in No. 72–1064).

John F. Arning, New York City (Roger L. Waldman, Charles W. Sullivan, and Sullivan & Cromwell, New York City, on the brief), for The First Boston Corp., Paul L. Miller, and Nicholas H. Bayard (defendants-appellees in No. 72–1064).

Robert E. Kushner, Asst. Gen. Counsel, SEC, Washington, D. C. (G. Bradford Cook, Gen. Counsel, David Ferber, Solicitor, and James J. Sexton, Atty., SEC, Washington, D. C., on the brief), for SEC (amicus curiae in No. 72–1064; plaintiff-appellant-appellee in Nos. 72–1053 and 72–1140).

348

INDEX
Page

PRELIMINARY STATEMENT --------------------------------- 349

I. EVENTS LEADING TO INSTANT LITIGATION -------- 349

II. CHRIS-CRAFT INDUSTRIES, INC. v. PIPER AIRCRAFT CORPORATION, ET AL. (No. 72–1064) ------------------ 355

(A) FUNCTION OF PRIVATE ACTION FOR DAMAGES IN ENFORCEMENT OF FEDERAL SECURITIES LAWS ------------------------------------------------- 356

(B) VIOLATIONS OF ANTIFRAUD PROVISIONS OF SECTION 14(e) OF 1934 ACT ----------------------- 357

(1) *Standing of CCI to Sue for Damages* ------------ 358

(2) *Defendants' Violations of Section 14(e)* ---------- 362

(a) Controlling Principles In Determining Section 14(e) Violations ------------------------------- 362

(b) Piper Family ------------------------------- 364

(c) BPC And Its Officers ----------------------- 366

(d) First Boston And Its Officers ---------------- 369

(3) *Causation* ------------------------------------- 373

(C) VIOLATIONS OF RULE 10b–6 UNDER 1934 ACT -- 377

(D) RELIEF TO BE GRANTED FOR VIOLATIONS OF SECTION 14(e) AND RULE 10b–6 ------------------ 379

(1) *Damages* --------------------------------------- 379

(2) *Equitable Relief* -------------------------------- 380

III. BANGOR PUNTA CORPORATION v. CHRIS-CRAFT INDUSTRIES, INC. (No. 72–1120) -------------------------- 380

(A) CLAIM OF MANIPULATION OF PRICES OF CCI STOCK ------------------------------------------- 381

(B) CLAIM OF ILLEGAL WAREHOUSING -------------- 383

IV. SEC v. BANGOR PUNTA CORPORATION (Nos. 72–1053 and 72–1140) --------------------------------------------- 383

(A) INJUNCTIVE RELIEF ------------------------------- 384

(1) *Erroneous Standard* ----------------------------- 385

(2) *Requirement of Intent* --------------------------- 385

(3) *Injunction to Protect Public Interest* -------------- 386

(4) *BPC's Past Violations* --------------------------- 387

(5) *BPC as a Conglomerate* ------------------------- 388

(6) *Abuse of Discretion* ----------------------------- 389

(7) *Mischievous Precedent* --------------------------- 390

(B) RESCISSION ORDER ------------------------------- 390

SUMMARY --------------------------------------------------- 392

Before MANSFIELD and TIMBERS, Circuit Judges, and GURFEIN, District Judge.*

TIMBERS, Circuit Judge:

## PRELIMINARY STATEMENT

These consolidated appeals present important questions, some of first impression, involving the antifraud provisions of the federal securities laws in their application to a contest for acquisition of a controlling stock interest in a target corporation. Among the questions presented are those involving the scope of liability and relief under Section 14(e) of the Securities Exchange Act of 1934 and the type of relief necessary, in an SEC enforcement proceeding, to effectuate the broad remedial purposes of the federal securities laws.

The appeals are from judgments entered after non-jury trials of three separate but related civil actions in the Southern District of New York before Milton Pollack, District Judge.

In Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, et al. (No. 72–1064), Chris-Craft appeals from the district court's dismissal after trial of its complaint against all defendants, 337 F. Supp. 1128 (S.D.N.Y.1971), essentially on the grounds that many of the alleged securities laws violations had not been proven, that those proven had not caused injury to Chris-Craft and that Chris-Craft had failed to prove its claim for damages. We reverse and remand.

In Bangor Punta Corporation v. Chris-Craft Industries, Inc. (No. 72–1120), Bangor Punta appeals from the district court's dismissal after trial of its complaint, 337 F.Supp. 1147 (S.D.N.Y.1971), on the ground of insufficient evidence to support Bangor Punta's claims that Chris-Craft had violated the securities laws or that such violations had caused injury to Bangor Punta. We affirm.

In SEC v. Bangor Punta Corporation (Nos. 72–1053 and 72–1140), the SEC appeals from those provisions of the district court's judgment after trial, 331 F.Supp. 1154 (S.D.N.Y.1971), which denied a permanent injunction against further violations of the securities laws and which imposed a condition upon Bangor Punta's rescission offer to former Piper shareholders. On the SEC's appeal, to the extent the judgment is appealed from, we affirm in part, and reverse and remand in part. On Bangor Punta's cross-appeal, we affirm.

I.

## EVENTS LEADING TO INSTANT LITIGATION

Before turning to the issues raised on appeal in each of the three actions, we shall set forth a narrative of the events, beginning in the latter part of 1968 and during 1969 in connection with the contest for control of Piper Aircraft Corporation, which culminated in the instant litigation. Facts having specific bearing upon the issues in each of the three appeals will be discussed in more detail in connection with our rulings below on those issues in each case.[1] Our task on these appeals has been greatly facilitated by Judge Pollack's detailed, comprehensive findings of fact, and particularly by his evaluation of the facts as found. While we disagree with certain

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The facts are substantially undisputed. We shall assume familiarity with the detailed statements of facts set forth in the prior reported opinions involving this contest for control of Piper. In addition to the three opinions of Judge Pollack referred to above (337 F.Supp. 1128, 337 F.Supp. 1147, 331 F.Supp. 1154), there was an earlier opinion by Judge Tenney denying Chris-Craft's motion for a preliminary injunction (303 F.Supp. 191 (S.D.N.Y.1969)), and an en banc opinion by this Court affirming the denial of the preliminary injunction, indicating certain violations of the securities laws and remanding to the district court for further proceedings not inconsistent with this Court's opinion. Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569 (2 Cir. 1970) (en banc).

of his conclusions, as will appear below, we take this occasion to commend him upon the clarity of his opinions in these complex cases.

Chris-Craft Industries, Inc. (CCI) is a Delaware corporation. It is a diversified manufacturer of recreational products. Its securities, common and preferred stock and convertible debentures, are traded on the New York Stock Exchange (NYSE).

Piper Aircraft Corporation (Piper) is a Pennsylvania corporation. It is one of the nation's leading manufacturers of light aircraft. Its 1,644,890 shares of issued and outstanding stock were traded (during periods relevant to these appeals) on the NYSE from October 1, 1968 to August 11, 1969 and then on the Philadelphia-Baltimore-Washington Stock Exchange (PBWSE). The three individual Piper defendants (referred to herein as the "Piper family") were officers and directors of Piper and owned about 325,000 of the 1,644,890 outstanding Piper shares.

Bangor Punta Corporation (BPC) is a Delaware corporation. It is a conglomerate with holdings in diversified fields. Its securities are traded on the NYSE. Defendants Nicolas M. Salgo and David W. Wallace are principal officers and directors of BPC.

The First Boston Corporation (First Boston) is a Massachusetts corporation. It is an investment banking firm and also a registered broker-dealer. In connection with the events involved herein, it served as investment adviser to Piper and as underwriter for BPC. Defendant Paul L. Miller is president of First Boston and defendant Nicholas H. Bayard is a vice president in its underwriting department.

In the latter part of 1968, CCI undertook a large financing program designed to produce excess cash that could be used primarily for acquisitions. On October 30, 1968, CCI filed a registration statement and preliminary prospectus for an offering of 6% convertible debentures up to $26 million in principal amount. The offer was made to shareholders and executives of CCI. It was largely successful, producing over $25 million in excess cash. At about the same time, Herbert Siegel, CCI's president and chief executive officer, discussed with the Philadelphia National Bank the obtaining of a revolving line of credit of up to $15 million. Such credit was granted and was drawn upon in February 1969 when needed.

CCI made its first purchase of Piper stock on December 30, 1968.[2] The purchase totalling 5200 shares was made through a confidential numbered account at Mitchell, Hutchins & Co., Inc., a member of the NYSE and a registered broker-dealer retained primarily by institutional investors. Additional purchases of Piper stock were made through Mitchell, Hutchins shortly thereafter in 1969:

| January 3 | 36,100 shares (34,200 from Madison Fund at $54) |
| January 6 | 22,000 |
| January 7 | 700 |
| January 8 | 30,900 (all but 200 from Keystone Growth Fund) |

CCI also made market purchases of Piper stock in the following amounts through other brokers:

| January 14 | 3,700 shares |
| January 20 | 800 |
| January 21 | 3,200 |

On January 22, CCI negotiated the purchase of 101,100 shares of Piper stock from Technology Fund, Inc. at $65 per share. This brought its total holdings in Piper to over 200,000 shares, approximately 13% of the outstanding Piper shares.

Up to this point, CCI had not officially informed Piper of its extensive pur-

2. CCI as of this date apparently had not yet decided to seek a controlling interest in Piper. Mr. Siegel testified that he had decided to buy the 5200 shares only a few days in advance and that he had not yet determined that an attempt to take over Piper would be advisable. The Board of Directors of CCI did not openly discuss the acquisition of Piper until its January 23, 1969 board meeting.

chases of Piper stock, nor had a public announcement been made.[3] On the morning of January 23, Mr. Siegel telephoned Mr. W. T. Piper, Jr., then President of Piper, and informed him that CCI would be announcing that day a cash tender offer for the purchase of Piper stock and that CCI had tentative plans to acquire a majority shareholder interest in Piper. In a statement released to the press that day, CCI announced a cash tender offer beginning immediately and ending on February 3 for up to 300,000 shares of Piper at $65 per share. The price of Piper stock on the NYSE at the close of January 22 was $52.50. CCI also revealed in its press release of January 23 that it was purchasing the stock for investment with a view to control of Piper, but that it did not presently have any specific plan or proposal with respect to the future of Piper.

The first response of the Piper management (essentially the Piper family) to the tender offer was to call a meeting on January 23 of representatives of First Boston (Piper's investment adviser), Chadbourne, Parke, Whiteside and Wolff (Piper's legal counsel), and Arthur Young & Co. (Piper's auditors). The next day, January 24, the Piper family decided to oppose CCI's bid for control of Piper. First Boston was asked to contact other companies to solicit proposals which might be preferable to a CCI takeover. BPC was one of the companies contacted. It showed considerable interest. But Piper did not follow up at that time.

The Piper family's resistance to the CCI tender offer took several forms. On January 25, the Piper Board adopted a resolution that CCI's offer was not in the best interests of the Piper shareholders and decided that this resolution

should be sent to them. Letters were sent out the same day asking Piper shareholders to delay accepting the CCI offer until the Piper management could adequately respond to it. This was followed by a letter dated January 27 over the signature of W. T. Piper, Jr.[4] The letter stated, among other things, that the Piper Board "has carefully studied this offer and is convinced that it is inadequate and not in the best interests of Piper's shareholders."

Also on January 25, Piper officers met with officers of Grumman Aircraft Engineering Corporation (Grumman) to discuss the sale of 300,000 unissued but authorized Piper shares to Grumman at $65 per share. An agreement was entered into on January 28 under which Grumman agreed to purchase 300,000 Piper shares at $65 per share; Piper agreed to seek approval from the NYSE for the listing of the new shares; and Grumman agreed to tender a check for $19,500,000 at a closing to be held within 3 days of the NYSE approval. The agreement was entered into with "the intention of Grumman and Piper to explore the desirability of a merger of their two corporations". Under the agreement, Grumman was given an option to put the shares back to Piper after six months at Grumman's cost plus $3\frac{1}{2}\%$ interest per annum running from the closing date. In order to guarantee the option, Piper was required to maintain the proceeds of the sale in a fund separate from its other assets and free of liens. A press release was issued by Piper on January 29 announcing that Grumman "has agreed to purchase" 300,000 shares of Piper subject to the approval of the Boards of both companies. The release further stated that the agreement was also conditioned on the shares being listed with the NYSE,

3. Section 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1) (1970), requires that certain reports be filed by a purchaser when he has acquired more than 10% of the outstanding stock of a company. CCI satisfied this requirement by filing a Schedule 13D with the SEC along with its tender offer materials.

4. This letter was prepared by D. F. King & Co. It was reviewed by the Piper family, by its legal counsel and by Mr. Bayard of First Boston.

352

on there being no material adverse change in Piper's business, and on there being no change in the management of Piper. A letter tracking the language of the release was sent to Piper shareholders on the same day. There was no mention of the "put" arrangement in either the press release or the letter to shareholders. The Grumman agreement was terminated by mutual consent on March 19 after the NYSE advised the parties that it would not list the new shares.

Returning to CCI's program for purchasing Piper stock, its tender offer resulted in its acquiring an additional 304,606 shares of Piper. This boosted CCI's total holdings [5] to 547,106 shares, or approximately 33% of the outstanding shares of Piper as of February 3. To obtain the additional 17% necessary for control, CCI decided to make an exchange offer. On February 14, the Board of CCI approved the making of an exchange offer without determining its terms. On February 27, CCI filed with the SEC an S-1 registration statement and a preliminary prospectus for an exchange offer to acquire a minimum of 80,000 and a maximum of 300,000 Piper shares. CCI issued a press release on May 7 announcing the specific package of CCI securities to be exchanged for Piper shares. First Boston estimated that the package was worth about $70-74 per Piper share. On May 12 and 16, the Board of CCI adopted resolutions approving the exchange offer and increased the value of the package by adding $10 cash.

Between March 18 and April 7, CCI had issued orders to Mitchell, Hutchins to continue purchases of Piper stock for CCI's account. CCI actually purchased 9100 shares while its exchange offer was being processed. On April 7, however, Mr. Siegel met with the SEC which warned him that such purchases violated Rule 10b-6 as the SEC interpreted it.

Mr. Siegel informed the SEC that CCI would cancel all outstanding orders and it did.

In the meantime, the Piper management continued to search for an effective maneuver to defeat CCI. On March 22, Piper entered into an agreement with United States Concrete Pipe Company of Florida to acquire all the outstanding shares of Concrete Pipe in exchange for 320,000 authorized but unissued Piper shares. On the same day, Piper agreed to acquire 99.466% of the shares of Southply, Inc. in exchange for 149,199 authorized but unissued shares of Piper. Piper apparently hoped that, by increasing the number of Piper shares outstanding, CCI would find Piper less attractive. The NYSE refused to list the new shares because the Piper family had failed to obtain the approval of Piper shareholders for the deals. When Piper itself issued the stock certificates, an extremely unconventional procedure, the NYSE suspended trading in Piper stock beginning April 7 and initiated delisting procedures. Piper rescinded the agreements on April 14.

Going back for a moment to CCI's program for purchasing Piper stock, its tender offer between January 23 and February 3 had resulted in its bringing its total holdings of Piper shares to 547,106 or roughly one-third of Piper's outstanding shares (including those privately purchased). Pursuant to its February 27 exchange offer (which terminated July 24), CCI acquired 39,826 additional Piper shares. And pursuant to its July 24 exchange offer (announced on May 7, approved by the CCI Board on May 12 and 16, and terminated on August 4), CCI acquired 112,089 additional Piper shares—thus bringing its total holdings of Piper shares to 668,295 or 41% of Piper's outstanding shares.

BPC's first contact with the contest for control of Piper came on January 24 when First Boston spoke to Nicolas M.

5. While the tender offer was outstanding, CCI continued to purchase Piper stock on the market. On January 24, 16,200 shares were purchased. Between January 27 and February 3, another 22,600 shares were purchased.

Salgo, BPC's Chairman of the Board, about the possibility of a deal between Piper and BPC. Mr. Salgo showed some interest but Piper broke off contact until February 24 when there was a meeting of Piper and BPC representatives concerning a merger of the two companies. BPC officials demanded that the Piper family sell to BPC all its holdings in Piper, which amounted to 31% of the outstanding shares. The Piper family gave no answer at that time. Further meetings were held on April 18 and 20. The Piper family did not decide to sell until late April or early May.

On May 8, a formal agreement was entered into between BPC and the Piper family. BPC made a "limited exchange offer" of specified BPC stock, warrants, and debentures (valued by First Boston at $70–72 per Piper share), for the total Piper family holdings of Piper stock, 501,090 shares. BPC also promised to use its best efforts to acquire additional stock to bring its holdings up to more than 50% of the outstanding Piper stock by a "further exchange offer" of "Bangor Punta securities and/or cash having a value, in the written opinion of the First Boston Corporation, of $80 or more per Piper share". It was further agreed that if BPC were successful in gaining control of Piper, and if First Boston determined that the package of securities received by the Piper family were valued at less than $80 on the opening day of the general exchange offer, the Piper family would be given stock and/or cash to make up the difference.

On May 8, a statement was released to the press by both Piper and BPC disclosing that BPC was acquiring the Piper family's stock holdings through an exchange offer for a package of BPC securities. The release contained a statement that BPC would offer to the remaining Piper shareholders a package of BPC securities to be valued in the judgment of First Boston "at not less than $80 per Piper share". This $80 valuation was repeated by David W. Wallace, President of BPC, to a reporter for the Wall Street Journal on May 16.

On May 26, the SEC brought an action against Piper and BPC in the District Court for the District of Columbia charging that the May 8 press release violated § 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(c) (1970), and Rule 135, 17 C.F.R. § 230.135 (1972), in that the release constituted an offer to sell securities before any registration statement had been filed, the $80 valuation having overstepped the Rule 135 exemption (a contention with which our Court agreed in its earlier en banc decision, 426 F.2d at 574). Both defendants consented to a permanent injunction without admitting any of the allegations of the complaint.

On May 16, BPC filed with the NYSE and the SEC a Schedule 13D describing the May 8 agreement. On May 29, BPC filed an S-1 registration statement for both of the exchange offers, and also filed a preliminary prospectus for the "further exchange offer". The May 29 offering, described as a tentative offering, was as follows:

1 share of BPC common

Series C warrants expiring 3–31–81 to purchase 3.25 shares of BPC common at $55

$15 principal amount of new 5½% convertible subordinate debentures, due 1994, convertible at $55

While awaiting SEC action on the exchange offer, BPC negotiated cash purchases of a total of 120,200 shares of Piper stock in the following private transactions: On May 14, BPC purchased 78,600 Piper shares from Fund of Funds Proprietary Fund, Inc. in Nassau at $79.25 per share. On May 15, BPC purchased an additional 20,000 Piper shares for $74.25 per share from American Securities Corporation. On May 16, 20 and 23, in three separate transactions, BPC purchased from Bay Securities Corporation the following Piper shares at the prices indicated:

| May 16 | 2,300 | $76 |
|---|---|---|
| | 700 | 75.95 |
| May 20 | 11,200 | 76.25 |
| May 23 | 2,200 | 76.37 |
| | 5,200 | 78.37 |

All these purchases were made in disregard of SEC Exchange Act Release No. 8595, issued May 5, 1969, announcing proposed Rule 10b-13. This Rule, when adopted, would specifically prohibit BPC's purchases because they were made during the pendency of an exchange offer for the purchased shares. The Release stated that "[t]his provision is, in effect, a codification of existing interpretations under Rule 10b-6."

The Piper family naturally supported the BPC exchange offer and took several steps to ensure its success. On June 4, a letter over the signature of W. T. Piper, Jr. was sent to all Piper shareholders urging them to read and study carefully the preliminary prospectus on the BPC exchange offer. Another shareholder letter was sent on June 20 extensively criticising the CCI exchange offer and suggesting that the offer "is not in your best interests". Finally, on July 25, a week after the BPC offer had become effective, W. T. Piper, Jr. sent another letter to shareholders strongly recommending the BPC offer; it stated that the Piper management had been impressed with the BPC management and operations and that a combination with BPC would be in the best interests of all shareholders.

BPC did not fix the final terms of its exchange package until July 18, the day it became effective. The final offer consisted of the following securities:

1.2 shares of BPC common
Warrants for 3.5 shares of BPC common

$31 principal amount of new 8¼% convertible subordinate debentures, due 1994, convertible at $55

On July 18, First Boston sent to BPC an opinion letter which valued the combination of BPC securities at not less than $80 per Piper share based on market and other conditions existing prior to the opening of business on that day. Neither the preliminary nor the final prospectus on the BPC exchange offer —nor the First Boston opinion letter—

referred to BPC's negotiations with another company for the sale of the Bangor and Aroostook Railroad, a major asset of BPC, for $5 million, which was $13.5 million less than the amount at which it was carried on the books. We shall discuss this more fully below.

To summarize CCI's public offers, on January 23, CCI had made its first tender offer for 300,000 Piper shares. By February 3, these efforts, together with its negotiated purchases, had gained CCI approximately 33% of the then outstanding Piper shares. On February 27, CCI filed with the SEC a registration statement and proposed prospectus for an exchange offer for a minimum of 80,000, a maximum of 300,000, additional Piper shares; after the period of this exchange offer had been extended six times, it finally was withdrawn on July 24 when CCI failed to obtain the minimum 80,000 shares. Still another exchange offer was announced by CCI on May 7, adding substantially more value to its earlier package; a new registration statement for this exchange offer was filed with the SEC on July 22; and a new prospectus was filed on July 24, the effective date of the offer.

The BPC exchange offer expired on July 29 with BPC acquiring 111,628 shares. CCI's second offer expired on August 4 and produced 112,089 shares.

The contest for control was not yet over, however, because after the expiration of both offers CCI and BPC owned only 41% and 45%, respectively, of the outstanding Piper shares. CCI made additional purchases of 29,200 shares between August 12 and 18, and then virtually withdrew from the struggle. BPC, on the other hand, continued to purchase for cash on the NYSE until August 11, and then purchased on the PBWSE until September 5. By September 5, it had acquired another 100,614 shares, enough to achieve a majority stockholder position in Piper (839,306 shares or 51%).

CCI had lost the battle for control after investing more than $44 million—

$38,295,238 in cash and $6,333,029 in other forms of consideration such as stocks and warrants.

## II.

### CHRIS-CRAFT INDUSTRIES, INC. v. PIPER AIRCRAFT CORPORATION, ET AL. (NO. 72–1064)

On May 22, 1969, while the contest for control of Piper was still being waged, CCI brought this action in the District Court for the Southern District of New York. The amended complaint alleged violations of Section 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(c) (1970), and Rule 135 promulgated under the 1933 Act, 17 C.F.R. § 230.135 (1972); it also alleged violations of Sections 9, 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i, 78j(b) and 78n(e) (1970), and Rules 10b–5 and 10b–6 promulgated under the 1934 Act, 17 C.F.R. §§ 240.10b–5 and 240.10b–6 (1972). The complaint sought damages and equitable relief.

On July 22, CCI moved for a preliminary injunction to prevent BPC from gaining and exercising control of Piper. Judge Tenney denied CCI's motion for a preliminary injunction on the grounds that CCI had failed to establish either irreparable injury if the motion were denied or unlawful conduct on the part of BPC. 303 F.Supp. 191.

An expedited appeal from Judge Tenney's order resulted in an en banc decision by this Court. Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F. 2d 569 (2 Cir. 1970). We held, in an opinion written by Judge Waterman, that a preliminary injunction was not required because BPC had stipulated upon oral argument not to effect a merger before the end of the litigation and we could perceive no other irreparable harm. We also ruled on the district court's alternative holding that the securities laws had not been violated, "for it [was] clear

that this ruling below would determine the outcome of the trial on the merits." *Id.* at 573. We held that the May 8 press release violated § 5(c) of the 1933 Act and Rule 135;[6] and that BPC's cash purchases of large blocks of Piper stock in May violated Rule 10b–6, but we made no determination whether the latter transactions were exempt under Rule 10b–6(a)(3)(2), which we discuss more fully at pages 377–79, *infra.* We remanded to the district court for proceedings not inconsistent with our opinion.

On remand, CCI limited its claim for relief to damages, foregoing any claim for equitable relief.[7] After trial on the merits before Judge Pollack, the district court filed an opinion. 337 F.Supp. 1128. The court found no merit in CCI's contentions that the Piper management misled the public by its January 23 letter which stated that CCI's cash tender offer was "inadequate", that the announcement of the Grumman agreement was deceptive because it failed to disclose the "put" provision, or that other January communications were misleading. The court rejected CCI's claim that the May 8 release was inaccurate, if "taken in its own terms". It found that, although the release violated § 5(c) of the 1933 Act, CCI had failed to show that this violation caused it to lose the contest or to increase unnecessarily its cost of acquiring Piper stock. The court held that the BPC registration statement for its exchange offer was "unintentionally in error" in failing to disclose the negotiations for the sale of the Bangor and Aroostook Railroad, but that CCI had failed to prove the scienter and causal effect necessary for a Rule 10b–5 or § 14(e) cause of action for damages brought by a party in the position of CCI. The court held that BPC's May cash purchases had violated Rule 10b–6 and were not exempt, but that the violations did not cause injury to CCI. The court faulted Piper for

---

6. The release was an "offer to sell" because it contained a statement of value and it was unlawfully issued prior to the filing of a registration statement.

7. CCI also amended its complaint to allege violations of § 16 of the 1934 Act, 15 U.S.C. § 78p (1970).

failing to disclose certain matters in its annual statements and other reports, but decided that CCI was not in a position to complain. With regard to the claims against First Boston, the court concluded that First Boston had not engaged in any conduct which operated as a fraud upon CCI or the public shareholders of Piper and that it should not be held liable for the actions of its client. The court held that Piper had failed to prove its counterclaim against CCI by not adequately showing violations of the law or that such violations were related to injury sustained by Piper. The court dismissed CCI's complaint against the corporate defendants and against each of the individual defendants.[8]

For the reasons stated below, we reverse and remand with directions to grant appropriate relief.

(A) FUNCTION OF PRIVATE ACTION FOR DAMAGES IN ENFORCEMENT OF FEDERAL SECURITIES LAWS

In order better to understand our rulings on the issues raised on this appeal —including our disagreement with the district court on certain issues—we believe it may be helpful briefly to delineate the proper function of the private action for damages in the overall pattern of enforcement of the federal securities laws.

This matter is squarely raised by the following observation by the district court in ruling on CCI's claims of violations of the antifraud provisions of the securities laws:

"In effect, Chris-Craft seeks the windfall of a punitive award against Bangor Punta by assuming the role of defender of the public interest in the purity of the registration process. This role has already been assumed by the Commission and we could well expect it to be assumed by exchanging

Piper holders if there were material harm to them." 337 F.Supp. at 1139.

The SEC of course has been entrusted —by the statutes and implementing decisions—with the primary responsibility of protecting the public interest under the federal securities laws. But the Supreme Court, as well as other federal courts including our own, have recognized that vigorous enforcement of the federal securities laws, particularly the antifraud provisions, can be accomplished effectively only when implemented by private damage actions. In J. I. Case Co. v. Borak, 377 U.S. 426 (1964), the Supreme Court emphasized that private actions provide "a necessary supplement to Commission action" and that "the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement" of the securities laws. 377 U.S. at 432. See Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2 Cir. 1951); Speed v. Transamerica Corp., 235 F.2d 369 (3 Cir. 1956).

This policy of vigorous enforcement through private litigation has been the instrument for forging many salutary developments in the securities fraud area, including a broadening of standing to sue and a relaxation of the elements of proof in a private action. A private right of action for damages has been implied for purchasers or sellers defrauded in violation of Rule 10b–5. Kardon v. National Gypsum Co., 69 F. Supp. 512, 513–14 (E.D.Pa.1946). Shareholders deceived by misleading proxy solicitations have been held to have a cause of action under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1970). J. I. Case Co. v. Borak, *supra.* The scienter requirement in a Rule 10b–5 private damage action appears to have been reduced to a knowledge of falsity or reckless disregard for the truth standard by our decisions in Heit v. Weitzen, 402 F.2d 909, 914 (2 Cir.

8. On appeal, CCI does not claim damages for BPC's violation of § 5(c) of the 1933 Act, and it has dropped its claim that Piper directly deceived CCI as a purchaser of Piper shares by false and misleading statements in Piper's financial and other reports.

Piper has not appealed from the dismissal of its counterclaim.

1968), cert. denied, 395 U.S. 903 (1969), and Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–91 (2 Cir. 1969), cert. denied, 397 U.S. 913 (1970), "to insure the maintenance of fair and honest markets in . . . [securities] transactions." Section 2 of the 1934 Act, 15 U.S.C. § 78b (1970). The reliance standard also has been relaxed under certain circumstances; for example, if a material omission or misstatement is proven, a presumption may be raised that the plaintiff relied on the deception to his detriment. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153–54 (1972) (Rule 10b–5 violation); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970) (§ 14(a) violation). These are merely examples of innovations that have been prompted in substantial part by a uniform policy of encouraging vigorous enforcement of the securities laws through private litigation.

To understand the indispensability of private actions in the securities area, and the necessity for facilitating such litigation, it may be illuminating to focus upon the reasons Congress enacted the antifraud and antimanipulation provisions of the statutes. Obviously Congress was concerned about the plight of the average public investor who is at a serious disadvantage in dealing with persons possessing superior knowledge, skill and resources. But the public in the role of investor is only part of the picture. The integrity and efficiency of the securities markets are even more important since our entire economy is dependent upon these markets. The securities market performs the essential function of assessing the value that society places upon the efforts of a particular enterprise so that society can obtain the maximum amount of its preferred goods and services that our resources can produce. This function can be performed effectively only if the delicately calibrated balance of factors affecting demand and supply are allowed to have their impact upon the market place through an unrestricted flow of information and funds. See Crossland & James, The Gods of the Marketplace: An Examination of the Regulation of the Securities Business, 48 B.U.L.Rev. 515 (1968). The securities laws seek to prevent restrictions which distort the market's estimate of value. Considering the weighty interests at stake, Congress and the courts justifiably have outlawed all unfair and deceptive practices related to the trading of securities and have encouraged private damage actions to implement the enforcement of the federal securities laws.[9]

## (B) VIOLATIONS OF ANTIFRAUD PROVISIONS OF SECTION 14(e) OF 1934 ACT

We turn now to one of the key issues on these appeals: CCI's claim that each of the defendants violated Section 14(e) of the Securities Exchange Act of 1934. We hold that they did.

We shall discuss seriatum with respect to this claim each of the subordinate issues as briefed and argued by the parties, namely, (1) standing of CCI to sue for damages, (2) defendants' violations of Section 14(e), and (3) causation. Then, after discussing CCI's further claim of violations of Rule 10b–6, we shall take up the form of relief to be granted.

9. Discernment must be exercised in determining whether a particular violation of an antifraud provision brings into play the policy of vigorous enforcement with all its effects. The Supreme Court's recent decision in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 11–13 (1971), indicates that a Rule 10b–5 cause of action may be stated even though the fact that a security somehow was involved in the underlying transaction is otherwise insignificant. In such cases, although there may have been a securities law violation, the harm caused by the violation may not be regarded as sufficiently momentous to justify a dilution of the standards of proof normally required in an action for fraud.

**(1)** *Standing of CCI to Sue for Damages*

CCI claims that defendants violated Rule 10b–5 or § 14(e) when, during the pendency of CCI's attempt to take over Piper, BPC and Piper issued improper and misleading press releases, BPC filed an exchange offer registration statement with material omissions, and the Piper family sent out shareholder letters with material omissions and misstatements. All the alleged violations relate either to a cash tender offer or to an exchange offer the purpose of which was to secure for the offeror a majority shareholder position in the target corporation.

Defendants contend that CCI lacks standing to complain of their alleged violations of Rule 10b–5 or § 14(e).

The district court found it unnecessary to decide whether CCI had standing under Rule 10b–5 because there was a failure to show causation; and it found that it was "unnecessary to decide whether § 14(e) may be separately invoked by one competitor for corporate control against another" since "our 10b–5 conclusions are dispositive of the issues as raised under Section 14(e)". 337 F.Supp. at 1134 and 1140.

█ We hold that CCI does have standing under § 14(e) to sue defendants for damages. Our holding is based on the statute itself and such decisional law as there is that has touched on the question.

Section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e) (1970), provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

The Senate Report which accompanied proposed § 14(e) indicates clearly—more specifically than does Rule 10b–5 [10]—that § 14(e) was intended to make applicable to a tender offer the long established antifraud proscriptions of the federal securities laws:

"Proposed subsection (e) would prohibit any misstatement or omission of a material fact, or any fraudulent or manipulative acts or practices, in connection with any tender offer, whether for cash, securities or other consideration, or in connection with any solicitation of security holders in opposition to or in favor of any tender offer. This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information to those with whom they deal." S.Rep.No. 510, 90th Cong., 2d Sess. (1968), quoted in 2 U.S.Code Cong. & Adm.News 2811, 2821 (1968).

See also H. K. Porter Co., Inc. v. Nicholson File Co., 353 F.Supp. 153, 163 (D.R.I.1972), aff'd, 482 F.2d 421 (1 Cir. 1973).

---

10. Rule 10b–5 under the 1934 Act, 17 C.F.R. § 240.10b–5 (1972), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

Section 14(e) is especially appropriate where, as in the instant case, the tender offer, in connection with which fraud is charged, was made with a view to obtaining control of a target company. The Williams Act of 1968, of which § 14(e) is a part, was enacted to control what has become an increasingly popular method of corporate acquisition—obtaining a majority of a corporation's stock rather than its assets. See Mundheim, Tender Offers, 2 Rev. of Securities Reg. 953 (1969). The Act added to § 13 of the 1934 Act subsections (d) and (e), which require tender offer disclosures similar to those required for issuance of new securities. Section 14(e) provides for openness and truthfulness in the solicitation of shares through tender offers and in the opposition to such solicitation.

Although the fraudulent acts involved in the instant case literally are proscribed by Rule 10b–5, we conclude that § 14(e) is the antifraud provision which more appropriately provides the basis for CCI's standing to sue here. It therefore is unnecessary for us to decide whether CCI has standing to sue under § 10(b) and Rule 10b–5.

A corporation in the position of CCI undoubtedly has standing to sue in a constitutional sense on the basis of the illegal acts alleged in the instant action.[11] Those who make tender offers have an economic interest in restricting their opponents to fair conduct, for fear that they themselves might incur injury because of practices which they are legally barred from meeting in kind. CCI's allegations indicate that it has "a personal stake in the outcome of the controversy", Baker v. Carr, 369 U.S. 186, 204 (1962), because it has suffered a pecuniary loss directly attributable to defendants' acts. See generally Flast v. Cohen, 392 U.S. 83, 94–101 (1968). Thus, under the requirements of the cases or controversies clause of the United States Constitution, CCI is an appropri-

---

11. The issue of standing to which we address ourselves is whether CCI is an appropriate party to be seeking relief on account of defendants' illegal conduct. As stated in Flast v. Cohen, 392 U.S. 83, 99 (1968), quoting Baker v. Carr, 369 U.S. 186, 204 (1962), a threshold question is presented by the provision in Article III, Section 2, of the United States Constitution, limiting federal judicial power to cases and controversies:

> "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . .'"

While a personal stake in the outcome meets the Article III requirement, a court must take into account other considerations before deciding that a plaintiff has standing to sue.

In the absence of a specific provision in a federal statute authorizing suit, the Constitution requires that we analyze the statute to ascertain whether a federal cause of action can be derived from it in favor of the plaintiff. See Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971). Depending on the statute, Congress may have intended, for any number of reasons, that only certain persons should be entitled to sue thereunder, and the plaintiff may not be one of them. See Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir.), cert. denied, 343 U.S. 956 (1952). On the other hand, Congress may have authorized the plaintiff to bring suit but limited the type of relief to which he is entitled. In short, the Constitution or statutory scheme enacted by Congress should be closely examined to determine whether the particular action brought by the plaintiff is explicitly or implicitly authorized.

The question whether a right of action or claim for relief exists under federal law is conceptually different from the *Flast* question. While attempting to make clear which concept we are discussing, we nevertheless shall refer to both as questions of "standing" since that is the term used in our prior decisions referring to § 14(e). See, e. g., Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 843 n. 1 (2 Cir. 1970); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 798–99 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 969–70 (2 Cir. 1969), cert. denied, 399 U.S. 909 (1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 944–46, 948 (2 Cir. 1969).

ate party to complain of such illegal acts.

We must also decide, however; whether CCI has a private federal right of action under § 14(e) against each of the defendants and, more specifically, whether it has a claim for compensatory damages.[12] Cf. Dyer v. Eastern Trust and Banking Co., 336 F.Supp. 890, 913–14 (D.Maine 1971). The statute is silent as to a private remedy. In deciding this issue, however, we are not writing from a clean slate. Our Court has spoken on the issue on at least four previous occasions. In Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 940–41, 944–46 (2 Cir. 1969), our holding on the merits made it unnecessary for us to reach a decision on the standing question, but we did indicate that a target corporation and nontendering shareholders could bring an action for a preliminary injunction under § 14(e) against an offeror charged with wrongdoing. In Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 843 n. 1 (2 Cir. 1970), a target corporation sought a preliminary injunction and we expressly held that standing existed under § 14(e), at least as to the misstatements in the annual report. See also Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075 (5 Cir. 1970). In Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970), after holding that a tender offeror had a Rule 10b–5 claim for relief against a target corporation under the "forced seller" principle, we went on to say that:

"The amendment to the Act adding section 14(e) (15 U.S.C. § 78n(e)), . . . should serve to resolve any doubts about standing in the tender offer cases, even where an offeror is not, as is Crane, in the position of a forced seller." 419 F.2d at 798–99.

See also H. K. Porter Co., Inc. v. Nicholson File Co., supra, 353 F.Supp. at 163. In upholding the dismissal of a Rule 10b–5 claim in another action brought by an offeror against a target corporation, we suggested that standing might be provided by § 14(e) although the 1968 amendment is an indication that "there was no standing to sue under Rule 10b–5 by either the tender offeror or by the target corporation". Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 969–70 (2 Cir. 1969), cert. denied, 399 U.S. 909 (1970).

While we have not heretofore squarely held that a private right of action for damages can be implied from § 14(e) in favor of a party in CCI's position, we have indicated that such an implied right of action would be reasonable. Section 14(e) prohibits, as stated above, material omissions and misstatements in communications favoring or opposing tender offers. Under well recognized common law principles, interference with a "prospective advantage", such as the opportunity to purchase property, gives rise to a cause of action in the person injured where the means of interference adopted alone is unlawful, even though the purpose in itself may be justifiable. Prosser & Smith, Cases and Materials on Torts 1131–52 (1967). CCI therefore probably could state a claim for relief in most state courts against each of the defendants for tortious interference. Through unlawful and deceptive practices, they allegedly have denied CCI a fair opportunity to succeed in its tender offers. We will

---

12. A party with a sufficient economic or legal interest at stake conceivably might be permitted to bring an action to vindicate the public interest. That is, although his own interest was not intended to be protected by the statute, he might be allowed to sue, because of his own economic interest in the result, on behalf of those whose interests were to be protected. Cf.

FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 476–77 (1940); Mutual Shares v. Genesco, 384 F.2d 540, 543–46 (2 Cir. 1967). But in such a suit by a "private attorney general", compensatory damages normally would be improper relief, although punitive damages might be permitted.

not infer from the silence of the statute that Congress intended to deny a federal remedy and to extinguish a liability which, under established principles of tort law, normally attends the doing of a proscribed act. See Kardon v. National Gypsum Co., 69 F.Supp. 512, 513–14 (E. D.Pa.1946).

■ We previously have noted, referring to § 14(e), that "[t]he legislative history of the 1968 amendment demonstrates that the focus of legislative interest was on the public shareholder; Congress wanted to ensure that he had the benefit of a full statement from the offeror, with a chance for 'incumbent management' to 'explain its position publicly', if so disposed, H.R.Rep.No. 1711, *supra*, at 2, U.S.Code Cong. & Adm. News at p. 2998." Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 945; Susquehanna Corp. v. Pan American Sulphur Co., *supra*, 423 F.2d at 1085. The general objective surely is to encourage extensive and accurate disclosure of information relevant to a tender offer. The Supreme Court made it clear in J. I. Case Co. v. Borak, *supra*, 377 U.S. at 432–33, that, in dealing with controversies involving the securities laws, we should not be reluctant to imply a private right of action when to do so will further the general objective of the statute involved. We can conceive of no more effective means of furthering the general objective of § 14(e) than to grant a victim of violations of the statute standing to sue for damages. CCI is such a victim, as recognized by common law tort principles. A party in its position is especially likely to vindicate the wrong inflicted upon it. Particularly in light of the enforcement rationale of *Borak*, we believe it is both necessary and appropriate that CCI should be granted standing to sue for damages. ·

In enacting § 14(e), while Congress did not explicitly state that shareholders of a target company are not the only persons entitled to the protection of the securities laws from fraudulent misrepresentations, it is a fair inference that a broader standing was intended. Since Rule 10b–5 covers all types of exchange offers, the major contribution provided by § 14(e) would appear to be a broader standing to sue—accorded both to the offeror and to the opposition—based on fraudulent securities transactions. See Bath Industries, Inc. v. Blot, 427 F.2d 97, 102 (7 Cir. 1970); Dyer v. Eastern Trust and Banking Co., *supra*, 336 F. Supp. at 914. In Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 940–41, we commented on the impact of § 14(e):

"In effect this applies Rule 10b–5 both to the offeror and to the opposition—very likely, except perhaps for any bearing it may have on the issue of standing, only a codification of existing case law."

While Judge Friendly's opinion in *Electronic Specialty* is not dispositive, its holding that the target company may sue goes some distance toward saying that contestants may also sue. Cf. Iroquois Industries, Inc. v. Syracuse China Corp., *supra*, 417 F.2d at 969–70.

■■ Our holding on the standing of CCI to sue for damages may be summarized as follows. The statutory language of § 14(e) is silent on standing; it neither confers nor excludes standing with respect to one in the position of CCI. As a distinguished commentator said years ago, in such a situation there is no need to try to discover "supposed legislative intent"; "[w]hether his offenses shall have any other legal consequence has not been passed on one way or the other as a question of legislative intent, but is left to be determined by the rules of law." Thayer, Public Wrong and Private Action, 27 Harv.L. Rev. 317, 320 (1914). Under common law tort principles, we hold that a claim for relief under federal law is stated where, as here, a defeated contestant for control has been put in a minority shareholder position because of the wrongdoing of its opponent and the margin of victory is only 7%. CCI has shown that it had a reasonable chance of obtaining control of Piper, but lost the opportunity

because its opponent gained control through means illegal under federal law. This is a case of first impression with respect to the right of a tender offeror to claim damages for statutory violations by his adversary. And our holding is premised on the belief that the harm done the defeated contestant is not that it had to pay more for the stock but that it got less stock than it needed for control.

We hold that CCI has a right of action for damages against all defendants for violations of § 14(e).[13]

### (2) *Defendants' Violations of Section 14(e)*

The district court held that the various communications to shareholders by members of the Piper family and the May 8 press release by Piper and BPC did not violate § 14(e), but that the BPC registration statement and prospectus were materially misleading. 337 F. Supp. at 1134–38, 1138–40. CCI challenges the court's holdings with respect to the Piper communications to shareholders and the May 8 press release. Defendants contend that the BPC registration statement and prospectus did not violate § 14(e). We hold that each of the defendants violated § 14(e).

### (a) Controlling Principles In Determining Section 14(e) Violations

Before turning to defendants' alleged violations of Section 14(e), a statement of what we believe to be the controlling principles in determining such liability may aid in understanding our rulings which follow.

■ Section 14(e) is relatively new. It has not been the subject of extensive judicial construction, and never in the context of the factual situation here presented. And yet the underlying proscription of § 14(e) is virtually identical to that of Rule 10b–5; the critical difference is that the latter is applicable only "in connection with the purchase or sale of any security", while the former is applicable "in connection with any tender offer . . . or any solicitation of security holders in opposition to . . . any such offer . . . ." In determining whether § 14(e) violations were committed in the instant case, we shall follow the principles developed under Rule 10b–5 regarding the elements of such violations. In short, we hold that a violation of § 14(e) is shown when there has been a material misstatement or omission concerned with a tender offer and when such misstatement or omission was sufficiently culpable to justify granting relief to the injured party. The key concepts in this formulation are *materiality* and *culpability*.[14]

■ The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell. We articu-

---

13. The fraudulent acts alleged to have been committed by Piper and its allies, BPC and First Boston, in effect were in the nature of countersolicitations to CCI's tender offers. CCI's right of action against each therefore is the same: to recover damages or to obtain other relief based on defendants' illegal conduct under § 14(e) to achieve an objective injurious to CCI.

14. It is well to bear in mind Judge Friendly's observations regarding § 14(e) in Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 948:
"The likeness of tender offers to proxy contests is not limited to the issue of standing. They are alike in the fundamental feature that they generally are contests. This means that the participants on both sides act, not 'in the peace of a quiet chamber,' Hellenic Lines Ltd. v. Brown & Williamson Tobacco Corp., 277 F.2d 9, 13 (4 Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960), but under the stresses of the market place. They act quickly, sometimes impulsively, often in angry response to what they consider, whether rightly or wrongly, to be low blows by the other side. Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management

lated the materiality standard in List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811 (1965), to be "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'"[15] The materiality test is concerned only with whether a prototype reasonable investor would have relied. See Heit v. Weitzen, 402 F.2d 909, 912–14 (2 Cir. 1968), cert. denied, 395 U.S. 903 (1969). Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest. See SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849.

As for the concept of culpability, intent to defraud is not an indispensable element in a private action under Rule 10b–5; knowledge of falsity or reckless disregard for the truth may be sufficient. See Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971); Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290–91 (2 Cir. 1969), cert. denied, 397 U.S. 913 (1970); Heit v. Weitzen, *supra*, 402 F.2d at 913–14; SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 854–55. We have indicated, however, that mere negligent conduct is not sufficient "to permit plaintiffs to recover damages in a private action under § 17(a) or § 10(b)." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 n. 15 (2 Cir. 1972).

██ The function of what has been called the "scienter" requirement is to confine the imposition of liability to those whose conduct has been sufficiently culpable to justify the penalty sought to be exacted. The initial inquiry in each case is what duty of disclosure the law should impose upon the person being sued. See Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9 Cir. 1962); Ellis v. Carter, 291 F.2d 270, 274 (9 Cir. 1961). In making this determination we should bear in mind that a major congressional policy behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them. See 1 Bromberg, Securities Law: Rule 10b–5, § 7.1, at 14 (1971). Those with greater access to information, or having a special relationship to investors making use of the information, often may have an affirmative duty of disclosure. When making a representation, they are required to ascertain what is material as of the time of the transaction and to disclose fully "those material facts about which the [investor] is presumably uninformed and which would, in reasonable anticipation, affect his judgment". Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963). A failure to perform these duties with "due diligence" in issuing registration materials provides a basis for suit under § 11 of the 1933 Act, 15 U.S.C. § 77k (1970). A knowing or reckless failure to discharge these obligations constitutes sufficiently culpable conduct to justify a judgment under Rule 10b–5 or § 14(e) for damages or other appropriate relief against the wrongdoer. SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 854–55.

to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality. As to this we reaffirm the test announced in *Symington Wayne, supra*, 383 F.2d at 843, whether 'any of the stockholders who tendered their shares would probably not have tendered their shares' if the alleged violations had not occurred.

See also General Time Corp. v. Talley Industries, Inc., *supra*, 403 F.2d at 161–162."

15. And in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2 Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976 (1969): "[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts . . . which may affect the desire of investors to buy, sell, or hold the company's securities."

In sum, and put as simply as possible, the standard for determining liability under § 14(e) on the part of a person making a misleading tender offer, or a responsible officer of a corporation making such an offer, is whether plaintiff has established that defendant either (1) knew the material facts that were misstated or omitted, or (2) failed or refused to ascertain such facts when they were available to him or could have been discovered by him with reasonable effort.

Our disagreement with the district court on whether defendants have violated § 14(e) does not go to its findings of fact, as to which the "unless clearly erroneous" test applies, but to its application of the legal standards just discussed. See Mamiye Bros. v. Barber S. S. Lines, Inc., 360 F.2d 774, 776–78 (2 Cir.), cert. denied, 385 U.S. 835 (1966).

We turn now to a consideration of the § 14(e) violations charged against each of the defendants.

### (b) Piper Family

CCI's charges against the Piper family stem from a series of communications to Piper shareholders in the form of shareholder letters and a press release.

The shareholder letters dated January 27 and 28, sent while the CCI tender offer was pending, stated that the Piper Board of Directors had "carefully studied this offer and is convinced that it is inadequate and not in the best interests of Piper's shareholders". It further stated that, if CCI were suddenly willing to offer shareholders $65, it must be-lieve that Piper stock is worth more than it is offering.[16] CCI contends that a reasonable shareholder would have assumed that "inadequate" referred to price. At that time Piper stock was selling on the market for considerably less than $65 per share. First Boston in fact had given Piper its opinion that the price offered was "fair and equitable". The Piper corporation itself, acting through the Piper family, at that time was contemplating a large sale of Piper stock to Grumman at the same price.

 The district court concluded that "inadequate" referred to factors other than price, such as the quality of Chris-Craft management. We disagree. A reasonable shareholder reading the letter most likely would assume that the reference was to price. Since price usually is what a person contemplating a sale of shares is most concerned with, a prudent shareholder naturally would assume that the Piper family was addressing itself to that consideration in opposing the offer. If the Piper family intended to refer to other factors, it surely would have been more specific. The Piper family's culpability regarding these shareholder letters is clear. Corporate officers and directors in their relations with shareholders owe a high fiduciary duty of honesty and fair dealing. See Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7 Cir. 1969). By reason of the special relationship between them, shareholders are likely to rely heavily upon the representations of corporate insiders when the shareholders find themselves in the midst of a battle for control. Corporate

---

16. The letter also stated that Piper was talking to major industrial corporations about combination and that if one could be put through, "a higher value could be realized for all shareholders." This was not misleading because Piper officials were trying to find an alternative, such as a merger, that would be better for themselves and Piper shareholders. The letter also urged shareholders to consider "important points" such as the facts that "Piper's sales increased more than 20% in fiscal 1968 over the prior year, and its earnings per share were approximately 29% higher." CCI maintains that they should also have disclosed that sales and earnings for the first quarter of the next fiscal year were down considerably compared to the first quarter of the previous year. We cannot say that, once Piper mentioned sales and earnings figures, it was required to reveal all relevant figures. Nor can we say that the decline was so severe that it made the previous year sales and earnings figures deceptive.

insiders therefore have a special responsibility to be meticulous and precise in their representations to shareholders. The Piper family obviously disregarded this obligation when they sent out these shareholder letters knowing that they were materially misleading.

 CCI also attacks the press release of January 29 by Piper officials that Grumman had "agreed to purchase" 300,000 shares of Piper at $65 per share. CCI argues that the tentative nature of the January 25 agreement was not adequately disclosed in the release. The agreement permitted Grumman to return the entire 300,000 shares for a refund of its purchase price plus interest within six months. This "put" provision was not disclosed in the press release, although it was described in Piper's application for listing with the NYSE. The release did reveal that the agreement was subject to the approval of the Piper and Grumman boards as well as other conditions. The published list of conditions gave the appearance of being exclusive, thus solidifying the impression that the sale was all but formally completed.

We find no fault in the Piper family's effort to avert through a Grumman merger what they had concluded was an unfavorable takeover by CCI. Such a maneuver is a common response to a takeover attempt. See Schmultz & Kelly, Cash Take-Over Bids—Defense Tactics, 23 Bus.Law 115; 132–34 (1967). We also agree with the district court's conclusions that the agreement was not a "sham" and that the "put" was a rational and logical part of the agreement. But Piper's failure to describe the put

in its press release, or in its subsequent letter to shareholders, constituted a material omission in violation of § 14(e). By failing to disclose this provision, the release portrayed the Grumman agreement as a completed, favorable deal between Piper and Grumman which also was likely to provide a basis for further and more profitable relations between the two companies.[17] The "agreement" actually was a preliminary and conditional overture directed toward a possible merger. The Piper family recklessly disregarded its obligation to shareholders in failing to disclose with substantial accuracy a transaction which was likely to affect the attitude of Piper shareholders toward the CCI tender offer.

 CCI also challenges the shareholder letters with respect to the BPC and CCI exchange offers on the ground that they failed to disclose the Piper family's financial interest in the success of the BPC general exchange offer. Letters dated June 4 and July 25 urged Piper shareholders to accept the BPC exchange offer. A June 20 letter disparaged the CCI exchange offer. All the letters were sent over the signature of W. T. Piper, Jr. None of the letters explained that, under the terms of the May 8 agreement between BPC and the Piper family, the Piper family might profit handsomely from BPC's acquiring a controlling interest in Piper.[18] The agreement provided, as stated above, that, if the value of the securities package traded to the Piper family for their Piper holdings was below $80 per Piper share on the effective date of the general exchange offer, BPC would make up the difference, *if* BPC were successful

---

17. This depiction of the agreement was further suggested by a statement in the release that the "purchase provides an opportunity for Grumman and Piper to study the feasibility and advantages of a possible combination of the two companies."

18. The preliminary and final prospectus for the BPC general exchange offer disclosed that there had been an exchange offer made to the Piper family and related

that under the May 8 agreement the family might gain from the success of the general exchange offer. We do not believe under the circumstances that disclosure in a detailed and extremely complex prospectus, which did not accompany the letters, fulfilled the Piper family's duty to reveal this material fact. Cf. Mills v. Electric Auto-Lite Co., 403 F.2d 429, 433 (7 Cir. 1968), vacated and remanded, 396 U.S. 375 (1970).

in obtaining over 50% of the outstanding Piper shares. The Piper family therefore potentially had an interest in the success of the BPC exchange offer. By July 25, they must have realized that this interest amounted to a considerable sum of money.[19] If the letters merely had supplemented the prospectus in providing publicity for the terms of the offer, there might be less basis for concern that the Piper family's self-interest was not disclosed. But the letters are replete with the personal opinions and recommendations of W. T. Piper, Jr. on the quality of the BPC securities and the management of BPC. The July 25 letter, sent after the Piper family must have known what they stood to gain in the event of a successful BPC takeover, stated that "we strongly recommend" the offer and "we have been impressed with the management and operations of Bangor Punta". Under these circumstances, the Piper shareholders were entitled to receive information sufficient to make an informed judgment on the weight to be given the personal recommendations of the Piper family. Cf. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 197–201 (1963).

We hold that the communications to Piper shareholders in the form of shareholder letters and a press release constituted violations of § 14(e) by the Piper family defendants.

### (c) BPC And Its Officers

■ CCI's claims that BPC violated § 14(e) arise from public communications and filed materials regarding the BPC general exchange offer. On May 8, Piper and BPC published a press release which stated that BPC had agreed

"to file a registration statement with the SEC covering a proposed exchange offer for any and all of the remaining outstanding shares of Piper Aircraft for a package of Bangor Punta securities to be valued in the judgment of the First Boston Corporation at not less than $80 per Piper share."

CCI contends that this statement was materially misleading because a reasonable investor would have interpreted the $80 value figure to be a guarantee of market value when the actual market value proved to be considerably less than $80. As stated above, we held in our earlier en banc decision that this statement of value violated § 5(c) of the 1933 Act but we made no determination whether the statement also was misleading. 426 F.2d at 573–76. We did observe that a prospectus "would have eliminated the possibility, perhaps the probability, that some persons would have construed the $80 figure as referring to market value when that value was neither accurate nor intended". *Id.* at 575.

The district court concluded that "the language of the May 8 release could not be confused by reasonable men . . . with offers intending or implying guarantees of market value." 337 F.Supp. at 1137 n. 9.[20] We agree. If the release were to be construed as a promise of future value, it would not be as a promise of market value A reasonably knowledgeable investor is aware that the "value" of a security can refer either to the market or sales price of the security or to its worth as measured by the assets and earnings of the issuing company. The absence of the term "market value" in the release, as well as the fact that the valuation was to be "in the judgment of the First Boston Corporation", would suggest to a prudent investor that "value" here was to be based on an appraisal of assets and earnings.

The statement of value was not a fraud violation for another reason. It was not a material representation. A rational investor considering whether to

---

19. One estimate placed the amount at a total of $13 million.

20. The district court also held that, even if a prudent investor might have interpreted "value" to mean market or resale value, the BPC package turned out to be worth $73 to $79, the difference between the promise and performance being "de minimis".

take advantage of the BPC exchange offer after it became effective would not have been influenced by the earlier promise of value when the actual package had been disclosed to him for scrutiny and value determination. We therefore agree with the district court that the May 8 release has not been shown to have been damaging to CCI.

BPC contends that the district court erred in holding that the BPC registration statement was misleading. The district court, in SEC v. Bangor Punta Corporation, *supra*, 331 F.Supp. at 1160–61, held that BPC's failure to disclose the circumstances which made the carrying figure for the Bangor and Aroostook Railroad (BAR) obsolete caused the registration statement to be misleading. BPC carried on its books its holdings in the BAR (98.7%) at $18.4 million. Although this amount was established through questionable accounting techniques, such techniques are not specifically attacked here.[21] CCI does charge that BPC failed to disclose that it had negotiated for a sale of the BAR at a price substantially below $18.4 million. Some additional facts are necessary to an understanding of this claim.[22]

At the April 1, 1969 BPC board meeting, BPC had considered disposing of the BAR and had appointed a committee headed by Curtis Hutchins to study various methods of disposition. On May 12 and 15, Hutchins met with Frederic Dumaine, Chairman of the Board of Amoskeag, Inc., to discuss the possible sale of the BAR to Amoskeag. On May 12, Dumaine offered $5 million for the BAR. He indicated no preference for buying assets or stock. On May 15, Hutchins provided Dumaine with information on the BAR, such as the railroad's cash flow figures and balance sheet. Dumaine decided that he wanted to buy the stock. Hutchins met with his committee the same day. They agreed that a sale to Dumaine at $5 million would be BPC's best course of action. At a BPC board meeting on May 21, Hutchins reported Dumaine's offer and his committee's recommendation.[23] He did not ask for approval of the sale but only for authority to continue negotiations. Nicolas M. Salgo, BPC's Chairman, suggested selling 51% of the BAR then and 49% later for a total consideration of $7 million. This proposal was rejected by Dumaine when it was later submitted to him. The BPC board resolved to study further the tax and accounting ramifications of the sale. On May 27, Hutchins and Dumaine formulated a letter of understanding concerning the sale. This was not signed by Hutchins. It stated that "you [Dumaine] and I have agreed . . . on the sale" at $5 million, but qualified this by noting that any understanding was subject to BPC board approval. Hutchins repeatedly explained to Dumaine that his authority was limited to exploring possibilities of divestiture and that he did not have the power to make a decision alone. On June 3, Hutchins met with the BPC management. They decided to table the matter while their tax and accounting departments studied the effect of selling assets rather than stock. On June 16, Hutchins informed Dumaine that the board had refused to approve the letter of understanding. He further explained that the BPC management considered it essential that the legal and accounting effects of the transaction be studied, and that these investigations probably could not be completed for another two months because other matters (the exchange of-

---

21. Among other things, the increase in book value resulting from a revaluation of the BAR was credited directly to earned surplus, thus by-passing the income accounts. This is dubious accounting procedure.

22. A full discussion of the BAR incident is set forth by the district court in SEC v.

Bangor Punta Corporation, *supra*, 331 F. Supp. at 1156–60.

23. Hutchins presented three options to the board: sale, merger, or status quo. He and the board rejected the last two options.

fer) had priority. Hutchins expressed to Dumaine his personal opinion that a deal would be made. On September 9, the board authorized Hutchins to make the sale to Amoskeag of BAR assets rather than stock, if possible, but basically with freedom to enter into the deal on whatever terms he decided were best. The agreement was entered into on October 2, 1969. This resulted in BPC sustaining a $13.8 million book loss, thus contributing to an $8,566,964 loss of net income for 1969 and to a reduction in retained earnings from $37.9 million at the end of fiscal 1968 to $20.5 million at the end of 1969.

The district court found that "the Bangor Punta directors could not [at the time of the exchange offer] have believed that the $18.4 million figure . . . any longer represented a responsible appraisal of market value of the BAR holding". 331 F.Supp. at 1161. It concluded that "[c]onsistency of fair disclosure required exposure of circumstances which so clearly rendered obsolete an appraisal made four years earlier". *Id.*

We hold, under the principles enunciated above for determining § 14(e) liability, that BPC was required to disclose to Piper shareholders the circumstances surrounding the negotiations for a sale of the BAR, to apprise them with a reasonable degree of accuracy of the seriousness of such negotiations, and to inform them of the basic effect this might have on the operations of BPC. In SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849, we stated the standard of materiality to be applied where an event has not yet occurred but certain facts are known in advance:

"[W]hether facts are material . . . when the facts relate to a particular event . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."

Hutchins and the other special committee members—Robertson, Stone and Siel—were highly knowledgeable about the BAR's affairs. Several had been past presidents of the BAR and all had managed it in some capacity. These men had decided in May 1969 that a sale to Amoskeag was the only viable alternative. Certainly the BPC board was likely to be strongly influenced by their decision. The board in fact had taken a position favorable to the sale from the beginning and was primarily concerned with getting as much out of the sale as possible. The board knew that a merger of the BAR with another New England railroad was improbable. If they kept it, there would have to be substantial capital outlays of $5 million over the next five years to break even. Under these circumstances, by July the board must have realized that a sale of the BAR at a price substantially below its carrying value would be effected in the near future. A possible loss of $13 million, moreover, would have a sufficiently drastic impact on the financial position of BPC to justify disclosure even if the probability of a sale were less. The district court found that a sale of the BAR at $5 million would eliminate 36% of BPC's retained earnings and 12% of the shareholders' book equity.

In addition to the sales negotiations, there were other circumstances indicating that the book value of the BAR was obsolete and unrealistic. Since 1967, the management of BPC had been trying to dispose of the BAR, originally through a merger with another railroad. They apparently realized that the BAR did not have a promising future. The $5 million offer from Amoskeag was the only realistic offer that BPC had received. This alone demonstrated that the BAR was not worth anything close to $18.4 million. BPC's auditors reported on May 20 that a sale to Amoskeag at $5 million would be reported as an extraordinary loss of $13.5 million.

On the basis of these facts, the district court concluded that the registra-

tion statement was "unintentionally in error" and that the omissions were "mere negligence". It further concluded that the requisite scienter for a private damage action had not been shown. We disagree.

The district court's findings of fact, supported by substantial evidence, do not warrant the conclusions that BPC's officers had decided to sell the BAR before the exchange offer became effective and had postponed consummation in order to avoid disclosure. Nor does the evidence show that BPC failed to disclose the sales negotiations in bad faith. As we have indicated above, however, intent to defraud is not an indispensable element in a private action for damages under the antifraud provisions of the federal securities laws. Heit v. Weitzen, *supra,* 402 F.2d at 913–14. The securities laws impose upon an offeror of an exchange offer a duty to act reasonably in discovering facts material to the offer as of the time of the transaction and in disclosing fully those material facts of which the offeree is presumably unaware and which ostensibly would influence his judgment. Cf. Kohler v. Kohler Co., *supra,* 319 F.2d at 642. Corporate officers have a reasonable area of discretion in determining how far to explore the facts and in deciding what facts need to be disclosed. So long as they operate within this area, the securities laws do not impose liability. In order to encourage candor in the securities market, and well informed decisions by investors, this discretion must be exercised with caution.[24]

We believe that the officers of BPC greatly transgressed their allowable area of discretion in not disclosing the BAR negotiations and other circumstances reflecting the value of the BAR. The officials in charge of the exchange offer were well aware of the discussions with Amoskeag and the activities of the special BAR committee. They also were aware of all the other circumstances that indicated that the book value of the BAR was deceptive and unrealistic. Their judgment not to reveal basic information about the then current status of the BAR holdings clearly was unreasonable. They showed reckless disregard for the import of their activities concerning the BAR. They knew that the book value of the BAR set forth in the registration statement was no longer realistic. Considering the totality of the facts and circumstances, they failed to discharge their clear duty of proper disclosure.

We hold that such conduct on the part of BPC and its officers violated § 14(e).

### (d) First Boston And Its Officers

CCI's claim that First Boston violated § 14(e) is based on its conduct in connection with the BPC exchange offer. First Boston was the underwriter and dealer-manager for the exchange offer. As such, it had ready access to the books and records of BPC. It availed itself of this privilege sufficiently to examine the minutes of the BPC board meetings, including those of April 1 and May 21. Representatives of First Boston did not see the letter of understanding between Hutchins and Dumaine. They did question BPC's management regarding the BAR and were informed that there were no plans at the time to dispose of the railroad. That appears to have been the full extent of First Boston's investigation.

The federal securities laws impose upon private parties the primary responsibility for verifying the accuracy and completeness of information provided to potential investors. See H.R. Rep. No. 85, 73rd Cong., 1st Sess. 2–3 (1933). For this reason, Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (1970), authorizes the purchaser

---

24. We do not hold that a corporation prima facie has acted unreasonably if the omission or misstatement is material. Corporate officials must be allowed considerable room for discretion; otherwise their normal functions as corporate officials will be inhibited. The totality of the facts and circumstances must be examined to determine whether the officials were reckless or grossly negligent.

of a security to sue the underwriter and others involved in the issuance of securities, if the registration statement contains a misstatement or misleading omission of material fact. A "due diligence" defense to such a suit is available to all but the issuer. Section 11(b), 15 U.S.C. § 77k(b)(1970), provides that a defendant can escape liability if he can prove that:

> "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part. of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

Section 11 of course provides a cause of action only for a purchaser of securities issued pursuant to a registration statement. We believe that § 14(e) imposes liability upon an underwriter in favor of a competing offeror, specifically where the misrepresentation occurs in the context of a contest for control. An underwriter is liable under § 14(e) as an aider and abettor of the issuer if he was aware of a material falsity in the registration statement or was reckless in determining whether material falsity existed. See SEC v. North American Research & Development Corp., 424 F.2d 63, 81 (2 Cir. 1970); Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, Contribution, 120 U. of Pa.L.Rev. 597, 620–46 (1972).

Section 14(e) provides that "[i]t shall be unlawful for any person to *make* any untrue statement of a material fact" or to mislead by omitting "to state any material fact". (emphasis added). An underwriter or dealer-manager for a securities issue does not actually prepare the registration materials. Thus, in a literal sense, it does not "make" statements to potential investors. But we do not read § 14(e) so narrowly. An underwriter by participating in an offering constructively represents that statements made in the registration materials are complete and accurate. The investing public properly relies upon the underwriter to check the accuracy of the statements and the soundness of the offer; when the underwriter does not speak out, the investor reasonably assumes that there are no undisclosed material deficiencies. The representations in the registration statement are those of the underwriter as much as they are those of the issuer.

Self-regulation is the mainspring of the federal securities laws. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to ·verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so. Since he often has a financial stake in the issue, he has a special motive thoroughly to investigate the issuer's strengths and weaknesses. Prospective investors look to the underwriter—a fact well known to all concerned and especially to the underwriter—to pass on the soundness of the security and the correctness of the registration statement and prospectus. See generally Note, Escott v. BarChris: "Reasonable Investigation" and Prospectus Liability Under Section 11 of the Securities Act of 1933, 82 Harv.L.Rev. 908 (1969). The Senate Report that accompanied proposed § 14(e) indicates that this degree of involvement by the underwriter in the making or opposing of a tender offer may subject him to liability if the registration materials are misleading:

> "This provision would affirm the fact that persons *engaged* in making or opposing tender offers or *otherwise seeking to influence* the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information

to those with whom they deal". (emphasis added). S.Rep.No. 510, 90th Cong., 2d Sess. (1968), quoted in 2 U.S.Code Cong. & Adm.News 2811, 2821 (1968).

 We turn now to a determination of whether First Boston violated § 14(e). Since we already have concluded that the BPC registration statement and prospectus were materially deficient, the remaining issue to be determined is First Boston's culpability. First Boston is a skilled, experienced and well respected dealer-manager and underwriter. It had an obligation with respect to the BPC exchange offer to reach a careful, independent judgment based on facts known to it as to the accuracy of the registration statement. Moreover, if it was aware of facts that strongly suggested, even though they did not conclusively show, that the registration materials were deceptive, it was duty-bound to make a reasonable further investigation.

 We hold that First Boston did not adequately perform its duty in these respects. The minutes of the April 1 and May 21 board meetings,[25] which were examined by the underwriting de-

25. In view of the critical bearing these minutes have upon the issue of First Boston's liability, we set forth the relevant portions.

The minutes of the BPC board meeting of April 1, 1969 included the following reference to the BAR (Appendix 763):

"ORGANIZATION AND LONG RANGE PLANNING.

Mr. Salgo * stated that he wished to discuss with the Board the general philosophy of the types of business in which Bangor Punta should be involved, and also share with the Board some of the thoughts of management in this connection. He stated that there had been under consideration for some time the question of whether minority interests in some of the more attractive operations, such as the Leisure Time and Public Security Groups, should be spun off, but that he, Mr. Robertson and Mr. Wallace are in unanimous agreement that this should not be done. Instead, there have been discussions about the possibility of spinning off, either in whole or in part, those companies where growth is not developing as rapidly as it is throughout the remainder of the Corporation. In particular, he stated that such discussions had centered upon the Process Engineering Group, the Railroad and the Textile Group. In this connection, he pointed out that the Textile Group is a substantial contributor of cash even though it is not in a growth area. Mr. Salgo stated that the earnings of the Process Engineering Group are small and we need to seriously consider whether this group could be sold to another company. With respect to the Railroad, he stated that there is a question as to whether it should eventually go into a larger railroad system.

Mr. Salgo further stated that it would be very helpful if a committee from the Board of Directors could study the possible divestiture of the Bangor and Aroostook Railroad resulting in public ownership of it, either in whole or in part. He asked Mr. Curtis M. Hutchins to serve as Chairman and Messrs. George H. Seal and Robert G. Stone to serve as members of this Committee, with Mr. W. Jerome Strout as an ex-officio member and advisor to the Committee."

* Chairman of the Board.

The minutes of the BPC board meeting of May 21, 1969 referred to the BAR as follows (Appendix 775–76):

"BANGER AND AROOSTOOK RAILROAD.

Mr. Curtis M. Hutchins, as Chairman of a special committee appointed by Mr. Salgo at the Board of Directors meeting held April 1, 1969 (Reference: BPC–4–1–69–28), reported that he and Messrs. Robert G. Stone and George H. Seal (members of the special committee) have just completed a study of the situation with respect to the Bangor and Aroostook Railroad and wish to submit to the Board their unanimous report through Mr. Hutchins.

Mr. Hutchins stated that there appears to be three possibilities which could be adopted with respect to the future of the Railroad. Bangor Punta might keep the Railroad as is, merge the Railroad with another railroad if that were possible, or sell the Railroad at the best possible price.

Mr. Hutchins stated that keeping the Railroad is not very appealing. He pointed out that because of the increased use of trucks and the restricted nature

partment of First Boston, disclosed the early discussions and negotiations concerning the disposition of the BAR. At the April 1 meeting, the board considered disposing of the BAR and appointed a committee to study the alternatives. At the May 21 meeting, a possible sale to Amoskeag was discussed extensively. The board showed considerable interest in the sale at the time and gave the impression of strongly favoring it. These minutes, if not sufficient in themselves to lead a reasonable person to believe that the registration statement was misleading, certainly would have impelled a reasonable person to explore further. The only additional investigation by First Boston was to question company officials about the possible sale of the BAR. First Boston did not seek verifi-

of the territory involved, it is doubtful that the traffic on the Railroad will increase. It appears that if the Railroad is to break even over the next five years, it will be necessary to spend substantial amounts of money for new freight cars and other equipment. He also stated that in discussing the situation with Mr. W. Jerome Strout, President of the Railroad, it appears that the amount of money to be expended might be as much as $5,000,000. Under these circumstances, Mr. Hutchins pointed out that it becomes more and more difficult to justify retention of the Railroad.

Mr. Hutchins next discussed the second possibility, that is, consolidating with another railroad. In this connection, he felt that a combination with the Boston & Maine Railroad, if otherwise possible, might result in Bangor Punta's receiving a third to a 40% interest in a new company. The consideration, however, would be in the form of securities rather than cash. Mr. Hutchins did not feel that this would be a palatable solution.

Mr. Hutchins next considered the question of selling the Railroad and to whom it might be sold. He pointed out that neither the Penn Central nor the Norfolk and Western Railroads have any known interest in the Bangor and Aroostook Railroad and a merger with either of these railroads is very unlikely. He stated that the only person whom he knew who might be interested in the Railroad is Mr. F. C. Dumaine, Jr., Chairman of Amoskeag Company. Mr. Hutchins stated that he has had preliminary discussions with Mr. Dumaine who had indicated that he might be willing to pay $5,000,000. in cash, a combination of cash and Bangor Punta securities, or Bangor Punta securities for the stock of the Bangor and Aroostook Railroad owned by the Corporation. At this point, Mr. Salgo asked whether it might be wise to offer to Mr. Dumaine 51% of the stock of the Bangor and Aroostook Railroad at book value, with an option to purchase the remaining 49% at a higher price, with a total consideration, therefore, of approximately $7,000,000.

(At this point, Mr. Flick was called away from the meeting and Mr. Wallace acted as Secretary for the remainder of the meeting.)

Mr. Hutchins stated that, in his opinion, Mr. Dumaine would not agree to a price of $7,000,000., but that he probably would be able to obtain the approval of the Board of Directors of Amoskeag Company at a price of $5,000,000.

Mr. Hutchins stated that he is not asking for an approval by the Corporation's Board of Directors at this time, but only the authority to continue discussions with Mr. Dumaine. He stated that he wishes to first ascertain whether Amoskeag Company is willing to submit a definitive proposal.

Mr. Salgo next suggested that he would like to have Mr. Dumaine transfer to the Corporation 22,500 shares of Bangor Punta $1.25 Convertible Preference Stock as consideration for an option on 51% of the Railroad, the option to be for sixty days with the provision that the stock would be forfeited if the option is not exercised. In discussing Mr. Salgo's proposal, Mr. Strout pointed out that Mr. Dumaine also wishes to enter into an arrangement with the Maine Central Railroad; he does not believe the Maine Central Railroad will agree if such an agreement existed between Amoskeag Company and Bangor Punta Corporation.

After considerable discussion, it was the consensus of the Board that Mr. Hutchins should attempt to negotiate on the 49/51% basis suggested by Mr. Salgo, but that he has the authority to negotiate on the basis of a sale of 100% of the Bangor and Aroostook Railroad subject to further investigation of accounting and tax ramifications of such a transaction and approval by the Board of Directors or the Executive Committee of the Board of Directors."

cation of the officials' answer that a sale was not anticipated at that time. Cf. Escott v. BarChris, 283 F.Supp. 643, 697 (S.D.N.Y.1968, McLean, D. J.).[26] It did not make a more careful search of BPC's records, nor did it talk to officials at Amoskeag after it discovered from the minutes that Amoskeag was the likely buyer. Under these circumstances, First Boston's certification of the BPC registration statement carrying the BAR at $18.4 million amounted to an almost complete abdication of its responsibility to potential investors, to CCI, and to others who relied upon it to detect misrepresentations. We hold that First Boston possessed enough information reasonably to deduce that the BPC registration statement was materially inaccurate.

We hold that the conduct on the part of First Boston and its officers violated § 14(e).[27]

### (3) *Causation*

One of the fundamental issues upon which we disagree with the district court is that of causation.

The district court correctly pointed out that CCI neither bought nor sold Piper stock on the basis of the communications from the Piper management, the May 8 press release or the BPC registration statement. The court concluded that CCI was seeking damages as a "defeated contender for control" without showing that "a single exchanging Piper shareholder would have refrained from the exchange *and* taken an offer for his shares from Chris-Craft instead of that from Bangor Punta". 337 F.Supp. at

1139. (emphasis that of district court). We hold that the district court applied inappropriate causation principles and erred in assessing the nature of CCI's complaint.

We agree with the district court's findings that CCI failed to show with reasonable certainty that it would have obtained a controlling position in Piper had it not been for the violations of the securities laws by BPC and First Boston. On the other hand, it is equally clear that BPC itself obtained control through its violations of the securities laws.

Since failure to disclose the BAR negotiations was a material omission, the next question is whether such omission was relied upon. It is important to note that, since the harmful effect of the negligence in this case did not depend upon the exercise of volition by CCI, but instead upon the exercise of volition by other persons, CCI need not show that it relied upon the deception. CCI must show that there was a misrepresentation upon which the target corporation stockholders relied and that this was in fact the cause of CCI's injury. See Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2 Cir.), cert. denied, 389 U.S. 970 (1967).

We have held that reliance is established in a Rule 10b–5 action if the " 'misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss' ". List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811 (1965). In many instances, courts have applied a subjective test to the reliance

**26.** The standard of reasonableness under § 11 of the 1933 Act is that of "a prudent man in the management of his own property". 15 U.S.C. § 77k(c) (1970). It is unnecessary for us to decide whether a reasonableness standard should be imposed under § 14(e) since First Boston's conduct, in our view, went far beyond mere negligence.

**27.** We agree with the district court that there is no merit to CCI's other claims against First Boston, essentially that it

was the chief strategist for Piper and BPC in the control battle. The district court found, based on substantial evidence, that in its capacity as investment banker First Boston merely provided professional services to these companies. The business decisions that led to violations of the securities laws were initiated by these companies, not by First Boston in its role as investment banker. We are aware of no authority for holding First Boston liable in that capacity.

requirements, considering such factors as the plaintiff's general business expertise, Clement A. Evans & Co. v. McAlpine, 434 F.2d 100, 104 (5 Cir. 1970), his familiarity with the affairs of the corporation, Kohler v. Kohler Co., 319 F.2d 634, 641–42 (7 Cir. 1963), and his access to the information misrepresented, Hafner v. Forest Laboratories, Inc., 345 F.2d 167, 168 (2 Cir. 1965). See generally Note, Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable?, 72 Colum.L.Rev. 562 (1972).

Where the transaction is accomplished through impersonal dealings, such as on a stock exchange, or for some other reason the factors that influenced the parties are not readily apparent, the decisions have discussed liability in terms of the "materiality" of the misrepresentation. See Heit v. Weitzen, 402 F.2d 909, 913 (2 Cir. 1968), cert. denied, 395 U.S. 903 (1969); List v. Fashion Park, Inc., supra, 340 F.2d at 462–64; Kahan v. Rosenstiel, 424 F.2d 161, 173–74 (3 Cir. 1970). This constructive reliance principle is particularly appropriate in class actions where proof of actual reliance by numerous class members would be impracticable. Kahan v. Rosenstiel, supra.

The Supreme Court adopted this principle in Mills v. Electric Auto-Lite Co., 396 U.S. 375 (1970). Mills was a class action brought by shareholders under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1970), complaining that proxy solicitation material recommending a merger failed to disclose a conflict of interest. The proxy contest was won by the alleged wrongdoers. They needed the votes of minority shareholders to achieve the victory. The Court, in an opinion by Mr. Justice Harlan, stated the causation principle to be applied:

"Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." 396 U.S. at 385.

The Court established a presumption of reasonable reliance in order to avoid an overly difficult burden of proof. This was to encourage the vigorous enforcement of the securities laws through shareholder suits, and to effectuate the congressional purpose of enabling shareholders to make informed decisions "by resolving doubts in favor of those the statute is designed to protect". Id.

The Supreme Court recently held that the Mills principle is applicable to a Rule 10b–5 damage action. Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972). In Ute, members of a large class of security holders had been influenced to sell because of a failure to disclose. The Court held:

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision . . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." 406 U.S. at 153–54.

Accord, Kohn v. American Metal Climax, Inc., 458 F.2d 255, 288–91 (3 Cir.), cert. denied, 409 U.S. 874 (1972).

The district court below acknowledged that in "a proper case" the Mills test is sound, but concluded that this was not an appropriate case. It also held that § 14(e) does not in any way alter the result. 337 F.Supp. at 1139–40. We disagree.

The Mills-Ute test may be appropriately invoked, as here, in the context of a suit under § 14(e) by an offeror against the target corporation and its allies. In such an action, the claim, as here, usually will be that the offeror's opponents have defeated him or im-

paired his efforts by misleading the target shareholders. H. K. Porter Co., Inc. v. Nicholson File Co., *supra,* 353 F.Supp. at 164. Concentration upon such shareholders often is the primary means of defeating the tender offer. Since the offeror usually is a sophisticated businessman, his opponents rarely will be able to deceive him directly. As we said in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 796 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970):

> "When [the offeror] entered the securities market with its tender offer, it was entitled to the Act's protection not only against being deceived itself but also against deception of the investing public designed to prevent the public from entering into securities transactions." [28]

In the instant case, the offeror was not directly deceived but it was directly injured by defendants' deception of the Piper shareholders.

The fact that CCI was not directly deceived is what makes application of the *Mills-Ute* test appropriate and essential. It would be unduly burdensome to require an offeror to prove actual reliance when, as here, there are numerous shareholders who undoubtedly possess a wide range of expertise and knowledge. It would be impractical to require CCI to prove that each individual Piper shareholder who failed to trade for CCI's stock, or who traded for BPC's stock, relied upon defendants' misrepresentations in doing so. These impracticalities are avoided by establishing a presumption of reliance where it is logical to presume that reliance in fact existed. Kohn v. American Metal Climax, Inc., *supra,* 458 F.2d at 288–91. As we have stated above, § 14(e) was designed to protect offerors from unfair and unlawful opposition. By "resolving doubts in favor of those the statute is designed to protect", Mills v. Electric Auto-Lite Co., *supra,* 396 U.S. at 385, we are implementing congressional intent not only to protect investors, but to make sure that contests for control between offerors and incumbent management, or other offerors, shall proceed fairly.

■ In applying the *Mills-Ute* test to the instant action, we presume that the Piper shareholders would not have accepted the BPC exchange offer but for the misrepresentations to which we have referred above. Even if we assume arguendo that BPC's offer was superior to that of CCI, taking into account the BAR loss, we still must conclude that BPC's success was unlawfully attained. Piper shareholders had a third option, i. e., to hold their shares, which presumably they would have chosen if all the material facts had been disclosed. Under the *Mills-Ute* test, we must presume that BPC's offer was not so appealing, considering the BAR loss, as to have attracted any takers. See Vine v. Beneficial Finance Co., *supra,* 374 F.2d at 635. Since BPC eventually acquired only about 51% of the outstanding Piper shares, it is clear that the 7% acquired through its exchange offer was critical to its success. Reliance and causation have been shown.

What the securities law violations caused was a denial to CCI of a fair opportunity to compete for control of Piper. The specific injury sustained was a reduction in the value of CCI's Piper holdings upon BPC's unfairly obtaining control. CCI spent large sums of money in actively seeking control. Its purchases were made in the reasonable belief

28. In *Crane,* the offeror, Crane, made a tender offer for stock in Air Brake, but was thwarted when an ally of Air Brake, Standard, made heavy market purchases in Air Brake so as to manipulate its price. We held that Crane was entitled to specified relief under Rule 10b–5 even though it had not established that its tender offer would have been more generally accepted if these violations had not been committed. The district court in the instant case distinguished Crane as a decision where the "character of the violation and the clear causal nexus were crucial to the . . . result". 337 F.Supp. at 1140. We do not read *Crane* in such a restricted fashion.

that its opponents would battle hard but within the law. CCI is entitled to compensatory damages for the decline in the value of the minority shareholder's interest with which it became encumbered as a result of competing against those who violated the securities laws.

 Even if CCI had discovered, prior to purchasing some of the shares that it now holds, that BPC was competing unfairly, it was not required to mitigate damages by dropping out of the contest. A victim of a securities fraud does not have to elect between pursuing his goal in spite of the unlawful tactics of his opponents and recovery of damages for injuries sustained. Indeed, if CCI's persistence in the fight despite the violations had brought it victory, it would not have sustained damages from being put in a minority shareholder's position.

The Piper family's violations also caused injury to CCI. Piper contends that since CCI was not able and willing to accept any more shares than it did accept as a result of the cash tender offer, the January letters to shareholders and the Grumman press release were harmless. The evidence does not support this contention.

Since CCI had decided by the time of the cash tender offer that its objective was to win control of Piper, it clearly was willing to accept as many shares as it could obtain. While it was ready to commit itself to purchase only 300,000 shares, that limitation does not indicate that it would not accept a substantial number of additional shares if tendered.[29] Indeed, it expressly reserved the right to purchase more than the 300,000 shares.[30] And although

Piper offered some evidence indicating that CCI might have trouble financing additional purchases, it appears that such financing was available. Mr. Gordon testified that, before the cash tender offer had expired, he had arranged with Burnham & Co. to borrow up to $22,000,000 if needed to purchase shares in excess of 300,000. Moreover, the fact that CCI bought only a few shares of Piper on the market after the termination of its cash tender offer is of little probative value. There are many possible explanations for this consistent with CCI's position that it would have purchased additional shares pursuant to the cash tender offer. For example, CCI might have been avoiding the expense of searching out small blocks of shares and the high transactional costs involved in purchasing them. We are satisfied that CCI had a desire to purchase, and was capable of purchasing, a substantial number of additional shares pursuant to its tender offer.

The January letters to shareholders and the Grumman press release misled the Piper shareholders into believing that CCI's tender offer was undesirable. CCI's tender offer could be fruitful only if Piper shareholders believed that the price was currently a fair one and would remain so for at least a reasonable period in the future. The fairness of the offer is demonstrated by the fact that, despite the misrepresentations of the Piper family, over 300,000 shares were tendered. Considering the soundness of the offer and the materiality of the Piper family's deceptions, it is a reasonable presumption that CCI was unlawfully denied the opportunity to purchase additional shares. See Crane Co. v. Westinghouse Air Brake Co., *supra*, 419 F.2d

---

29. Mr. Gordon testified, when asked why CCI had committed itself to purchase no more than 300,000 shares, that one reason was that "[w]e did not want . . . Piper to emphasize the fact that the financing for the shares beyond 300,000 had not yet been arranged—to emphasize that successfully, because we knew we could arrange it, but we didn't have it at that time."

30. Officers of CCI announced to the press that the tender offer was successful. The Piper family would have us construe this announcement as a concession that CCI did not expect or desire more from its cash tender offer. As is well known, such statements in this context often are made for the sake of appearance. We decline to ascribe to them the interpretation suggested by the Piper family.

at 797. Moreover, these misleading statements most likely had a continuing adverse effect on CCI's attempts to acquire Piper shares. When Piper shareholders were deciding whether or not to accept CCI's exchange offer, many undoubtedly remembered and were influenced by the Piper family's misleading January statements portraying CCI as a company that made inadequate and unfair offers.

■ We hold that, considering the narrow margin of victory here, the Piper family's misstatements and omissions in the January shareholder letters and the Grumman press release denied to CCI a fair opportunity to win the contest for control.

The June and July letters to Piper shareholders are a different matter. Although they omitted any reference to the arrangement between the Piper family and BPC whereby the family might gain a considerable amount of money if BPC were to be successful in gaining control of Piper, CCI protected itself against injury from such omission by sending letters to all Piper shareholders on June 16 exposing this non-disclosure by the Piper family. The nature of the Piper family's personal stake in the exchange offer was fully described. We therefore conclude that this omission was rendered harmless.

We hold that the record establishes that the injuries sustained by CCI were caused by the violations of the securities laws by BPC and its named officers, First Boston and its named officers, and members of the Piper family.

(C) VIOLATIONS OF RULE 10b–6 UNDER 1934 ACT

We turn now to CCI's claim that BPC's cash purchases between May 14 and 23 of three large blocks of Piper stock violated Rule 10b–6 under the 1934 Act, 17 C.F.R. § 240.10b–6 (1972), and that such purchases caused injury to CCI. We hold that they did.

Rule 10b–6 prohibits bids for or purchases of a security by or on behalf of the issuer of a security if the security is "the subject of . . . [a] distribution". Included within the prohibition are bids for or purchases of "any right to purchase any such security". Clearly here, Piper stock, within the meaning of Rule 10b–6, was a "right to purchase" BPC stock.

On May 14, BPC purchased 78,600 Piper shares from Fund of Funds Proprietary Fund, Ltd. (FOF). On May 15, it purchased an additional 20,000 Piper shares from American Securities Corporation. And between May 16 and 23, it purchased an additional 21,600 Piper shares from Bay Securities Corporation. Thus, during this 10 day period and while its exchange offer for Piper shares was pending, BPC made three block purchases of Piper stock totalling 120,200 shares.

In our earlier en banc decision, we held that these purchases fell within the prohibition of the first sentence of Rule 10b–6. Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 576–77 (2 Cir. 1970). Our reasoning was that such large purchases by BPC had a tendency to boost the market value of Piper stock to an artificial level. Since the purchases were made shortly after BPC announced on May 8 that it would make an exchange offer, reasonable investors were likely to have attributed the increase in the price of Piper stock to the soundness of BPC's exchange offer. As a result, the operation of the market would tend to raise the market price of the BPC package to align it with the inflated Piper price. Rule 10b–6 was designed to prevent such manipulation of a security which is "the subject of . . . [a] distribution". See SEC v. Scott Taylor & Co., 183 F. Supp. 904, 907 (S.D.N.Y.1959). We therefore concluded that Rule 10b–6 had been violated but we remanded for a determination of whether the exemption contained in Rule 10b–6(a)(3)(2) was applicable and what remedy, if any, was appropriate. 426 F.2d at 577.

On remand, BPC claimed the applicability of the exemption only with respect to its purchase from FOF on May 14.

The district court held that "[a] literal reading of the exemption requires a finding that the [FOF] purchase, like the others, was not exempted". 337 F. Supp. at 1141. BPC does not contest this holding. The court concluded, however, that these were "technical violation[s]" and that there was not enough substance to them to support a finding that CCI was damaged. *Id.* at 1141–43. We disagree.

■■■ Since the violations constituted a manipulation of the price of BPC, the question arises whether CCI is a proper party to sue on this claim since it did not accept the BPC exchange offer.[31] CCI's contention is not that it was misled by BPC's purchases of Piper stock. It does contend that Piper shareholders were misled into accepting the BPC exchange offer because the Rule 10b–6 violations had a tendency to inflate the market value, and that CCI, as BPC's rival for the Piper stock, was thereby injured. Cf. Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2 Cir.), cert. denied, 389 U.S. 970 (1967). The SEC's policy statement of May 5 announced that purchases of stock of a target company during the pendency of an exchange offer are forbidden by Rule 10b–6 in order to promote fairness in contests for control. We find nothing in the language or history of Rule 10b–6 to suggest that only purchasers of the manipulated stock are entitled to bring an action.[32] We hold that CCI has a right of action to complain that BPC's Rule 10b–6 violation caused it injury.

The remaining question is whether BPC's cash purchases misled the Piper shareholders by artificially boosting the market value of the BPC securities and,

if so, whether this deception was in fact the cause of the injury for which CCI seeks redress. The district court held that, although the purchases were literally proscribed by Rule 10b–6, Piper shareholders were not necessarily misled because, among other reasons, the purchases were not designed to produce a stimulating effect, were not radiated into the general market, and were not made through an exchange or regular broker-dealer. 337 F.Supp. at 1142–43. We hold that, since the purchases were in violation of Rule 10b–6 and were not exempt, CCI is entitled to recover damages from BPC based on such violations.

■■ Either the purchases were prohibited by the Rule or they were not. If they were, as we have held, then presumptively a stimulating effect was produced which misled the public. Rule 10b–6 was drafted by the SEC on the basis of its considerable expertise and familiarity with market factors. It determined that a purchase that meets all the criteria set forth in the Rule will have a false prodding effect on the price of the distributed security and therefore should be outlawed. On the basis of the facts presented here, we refuse to second guess the wisdom and rationale of the Rule. Cf. H. Kook & Co. v. Scheinman, Hochstin & Trotta, Inc., 414 F.2d 93, 98 (2 Cir. 1969). Piper shareholders presumptively were deceived by a material alteration in the value of the exchange package. They no doubt were influenced by this deception to take advantage of what seemed to be a highly favorable BPC exchange offer.[33]

■■ BPC's unlawful conduct denied CCI a fair chance to compete for control of Piper. We cannot say that CCI

---

31. The district court held that CCI had standing to sue on the Rule 10b–6 violation. 337 F.Supp. at 1133.

32. Rule 10b–6 does not contain the clause, "in connection with the purchase or sale of any security", which limits a cause of action under Rule 10b–5. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir.), cert. denied, 343 U.S. 956 (1952).

33. CCI need not prove actual reliance by Piper shareholders. Rule 10b–6 creates a presumption that illegal purchases will substantially inflate the price of the security. A reasonable investor is likely to rely on this inflation in deciding to accept the exchange offer. See Mills v. Electric Auto-Lite Co., *supra*, 396 U.S. at 385; Affiliated Ute Citizens v. United States, *supra*, 406 U.S. at 153–54.

would have obtained a majority of Piper stock had BPC not violated the law, but it is a fact that BPC obtained control through its unlawful acts. Its May purchases of large blocks of Piper stock operated in the market to make BPC's exchange offer deceptively attractive. Success on that offer was necessary to achieve control. More important, the unlawful purchases themselves constituted about 7% of the outstanding shares of Piper. BPC eventually acquired only 51%. Even arithmetically, it is apparent that the block purchases in violation of Rule 10b–6 were essential to achieve control. BPC's attainment of a majority position has caused CCI to suffer a decline in the value of its Piper holdings.

We hold that CCI is entitled to recover damages from BPC based on its violations of Rule 10b–6.

(D) RELIEF TO BE GRANTED FOR VIOLATIONS OF SECTION 14(e) AND RULE 10b–6

Having held that all defendants violated Section 14(e) and that BPC violated Rule 10b–6, we turn now to the form of relief to which CCI is entitled.

■ Normally, the form of appropriate relief should be left for determination by the district court upon remand, as was done after consummation of mergers achieved as a result of securities laws violations in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386–89 (1970); J. I. Case Co. v. Borak, 377 U.S. 426, 433–35 (1964); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 803–04 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970).

In the instant case, however, we believe that it is incumbent upon us to provide specific guidance to the district court as to the form of relief to be granted upon remand. There are several reasons of this. First, as indicated above, the district court did not reach the issue of relief to be granted, since it held that most of the alleged securities laws violations had not been proven, that those proven had not caused injury to CCI and that CCI had failed to prove its claim for damages. Second, under the posture of the case in the district court, CCI limited its claim for relief to damages, but on appeal has pressed its claim for equitable relief as well as damages. Third, this litigation has been under way for more than three years, with one appeal already having been decided en banc by our Court. And, finally, certain of the questions presented are of first impression, chiefly the application of the antifraud provisions of the federal securities laws to a contest for acquisition of a controlling stock interest in a target corporation.

In short, the district court deserves guidance from this Court on the form of relief to be granted. We therefore order, upon remand and after appropriate opportunity has been afforded to the parties to be heard on the issue of relief, that the district court should grant at least the following relief:

(1) *Damages*

Piper has come under the dominance of BPC, with many of its management positions being assumed by BPC officers. It has been operated that way for two or three years. Divestiture of the ill-gotten shares would not be appropriate under the circumstances of this case because it would be difficult to administer and would unnecessarily reopen the control battle. CCI understandably no longer desires to take control of a company that has been substantially changed. It seeks damages.

■ We have held that the unlawful conduct of the Piper family,[34] of BPC

---

34. The Piper Aircraft Corporation itself was not a perpetrator of the violations of the securities laws. The evidence shows that members of the Piper family acted not on behalf of the corporation in committing their illegal acts, but in their own individual interests. The district court correctly characterized Piper as "the prize in the battle, not a contender". 337 F.Supp. at 1146. We agree that no liability is to be imposed on the Piper Aircraft Corporation.

and its named officers, and of First Boston and its named officers has caused financial loss to CCI for which it should be compensated. The measure of damages should be the reduction in the appraisal value of CCI's Piper holdings attributable to BPC's taking a majority position and reducing CCI to a minority position, and thus being able to compel a merger at any time. Since the conduct of each of the defendants, through their violations of the securities laws, contributed to the success of BPC's takeover attempt, a judgment should be entered assessing damages against all defendants jointly and severally. See Section 18(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78r(b) (1970).[35]

### (2) Equitable Relief

 We further hold that BPC should be denied the fruits of obtaining Piper shares illegally. We therefore direct that the district court include in its judgment an injunctive provision barring BPC from voting for a period of at least 5 years the Piper shares it obtained through the unlawful May cash purchases and those it obtained through its exchange offer.[36]

While we believe that the foregoing relief should be sufficient, our direction that the two provisions indicated above should be included in the judgment to be entered on remand is not intended to foreclose the district court from fashioning such additional appropriate relief as it may find necessary to implement our decision herein, after affording the parties an opportunity to be heard on the issue of relief.

The judgment of the district court on the appeal in No. 72–1064 is reversed and the case is remanded.

## III.

## BANGOR PUNTA CORPORATION v. CHRIS–CRAFT INDUSTRIES, INC. (No. 72–1120)

In this second of three related appeals, BPC appeals from the district court's dismissal after trial, 337 F.Supp. 1147 (S.D.N.Y.1971), of BPC's complaint which sought damages from CCI for alleged violations of the securities laws during the contest for control of Piper, BPC's principal claim being that, because of CCI's wrongful acts, BPC paid more than it otherwise would have paid to acquire control of Piper.

The complaint alleged violations of various provisions of the securities laws, including violations of Sections 9(a)(2) and 10(b) of the 1934 Act, 15 U.S.C. §§ 78i(a) and 78j(b) (1970); of Rules 10b–5 and 10b–6 promulgated under the 1934 Act, 17 C.F.R. §§ 240.10b–5 and 240.10b–6 (1972); and of Section 17(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(a) (1970).

At the trial before Judge Pollack, BPC adduced no proof specifically as plaintiff in the instant case, but instead relied on the record in Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, et al. (No. 72–1064). After trial, the district court dismissed the complaint essentially on the grounds that the winner in a contest for control is not entitled to seek damages against the loser for alleged violations of the securities laws, that whatever BPC paid for control was attributable not to any alleged securities laws violations by CCI but to BPC's own determination to obtain control, and that BPC had not supported with credible evidence its contentions that CCI had violated the securities laws

---

35. On April 25, 1973 the petition for rehearing on behalf of appellees Paul L. Miller and Nicholas H. Bayard was granted, see p. 407, infra, to the extent of adding the following sentence at this point in the opinion:

"In view of the voluminous record, upon remand, the district court shall determine from the record whether, under the principles of liability regarding First Boston and its officers in this opinion, Paul L. Miller and Nicholas H. Bayard, or either of them, is individually liable."

36. This injunctive provision of course would not apply to those Piper shares which are retransferred to former Piper shareholders who take advantage of the rescission order referred to below.

cr that such violations had caused injury to BPC.

Since we affirm the district court's dismissal of the complaint on the ground that BPC failed to adduce sufficient evidence to prove that the securities laws were violated, we do not reach the question whether BPC's allegations state a claim for relief under Rule 10b–5.

### (A) CLAIM OF MANIPULATION OF PRICES OF CCI STOCK

██ The gravamen of BPC's claim is that CCI violated the securities laws in an attempt to gain control of Piper, and that these violations caused BPC to pay more for Piper stock than it otherwise would have been required to pay. BPC's prime contention is that CCI acted in concert with others unlawfully to inflate the market price of CCI stock at the time of CCI's exchange offer so that the offer would be deceptively attractive. This alleged inflation of CCI's price is said to have had the secondary effect of driving up the price of Piper stock.

To prove such price manipulation, BPC relies upon inferences from a series of events. The relevant occurrences began in 1968 when Roger Spencer, a vice-president of Mitchell, Hutchins & Co., Inc. (a brokerage firm with close ties to several mutual funds), took an interest in CCI as a possible investment for Mitchell, Hutchins' clients. Spencer conducted an investigation of CCI that included several conversations with Herbert Siegel, President of CCI. Spencer subsequently recommended to several of his clients that CCI would be a sound investment. Several of these funds—Technology Fund, Inc. (Tech Fund), Investors Diversified Services, Inc. (IDS), Newton Fund, Inc. and Commonwealth Edison Pension Fund, Inc.—eventually were involved in the purchase of CCI stock.

IDS is a manager of a complex of mutual funds. Two of its managed funds, Investors Mutual, Inc. and Investors Stock, Inc., purchased 28,300 shares of CCI common in the period January 14–23, 1969. Another purchase of 53,900 shares was made on January 24 and 25. By January 31, the two funds had acquired 94,600 common and 24,700 of $1.40 preferred; another IDS fund had purchased 9000 common.

Tech Fund, a registered investment company, not only purchased many shares of CCI stock, but also, as discussed above in our opinion in No. 72–1064, sold 101,100 shares of Piper to CCI on January 22 at $65 per share. On the same day that the Piper sale was completed, Tech Fund apparently decided to acquire 50,000 shares of CCI common and 10,000 shares of CCI preferred. These purchases were made between January 23 and February 25.

About this time, several other organizations also began making purchases of CCI stock in large amounts. American Investors Fund, Inc. (AIF) bought 22,500 common and $78,000 of 6% convertible debentures on four trading days beginning February 7. Keystone Custodian Services, Inc. (Keystone), fund managers, recommended that its Polaris and S-4 Funds buy CCI stock. The two funds purchased 130,000 shares of CCI common between January 20 and April 28. Between January 14 and February 25, these four organizations acquired 17% of CCI's outstanding common stock. These large purchases significantly contributed to a rise in the price of CCI common from $40 on January 13 to $58¼ on February 11, an increase of 45% over the average price during the preceding six weeks.

BPC maintains that these heavy market purchases by the funds were instigated by CCI through agreements and by providing inside information about its bids for Piper. Mitchell, Hutchins allegedly was the intermediary in this scheme. BPC's evidence of "agreements" clearly is insufficient. It contends that Tech Fund agreed to purchase CCI stock in return for CCI's buying Tech Fund's Piper holdings at a "premium price". This is pure surmise. There is no evidence of an actual agree-

ment to that effect or that the parties even discussed such an agreement. The price paid for the Piper stock, $65, was not a "premium" price since the next day CCI announced a large cash tender offer at the same price. IDS allegedly made purchases because it was a principal holder of CCI senior notes and therefore had an interest in the success of CCI's takeover attempt. This interest is not sufficient proof that IDS wilfully manipulated the price of CCI stock.

BPC also has failed to show that CCI gave illegal insider tips to spur market purchases of its stock. CCI did make known that it was planning to make acquisitions in the leisure-time field but this was a well publicized intention.[37] Indeed, most of the funds' purchases were made after CCI announced its tender offer. Any well informed investor by then would have known CCI's plans. It is evident that the funds purchased CCI heavily because their customary sources of information, such as Mitchell, Hutchins, revealed that CCI's acquisition of a company such as Piper probably would increase the value of CCI stock. It was a reasonable investment decision on their part, induced not by a desire to inflate artificially the value of CCI stock, but by the prospect of gain. As we indicate below, these investments proved to be ill-advised and of little benefit to CCI or the funds. We cannot conclude on the basis of such evidence that the district court's findings were clearly erroneous.

BPC further contends that a manipulative intent is shown by the timing of the funds in disposing of their CCI holdings. CCI stock decreased in value substantially in the spring and summer of 1969, along with the general market decline. One of the three IDS funds sold its entire 9000 shares in March because of CCI's difficulties with the Piper takeover. The other two IDS funds retained

their CCI investments and sustained book losses of more than $4,600,000. Tech Fund, after selling 1600 of its shares on March 28, decided on April 1 to sell out its entire position. It accomplished this total disposal by selling gradually through July 7. It sustained a $691,000 loss on an investment of $3 million. AIF sold out completely between April 30 and May 20. The Keystone funds retained their holdings until August 1 and disposed of their entire position within the month, incurring a $3,625,048 loss on a $6,447,579 investment. These funds sustained a total loss of about $9,000,000 on their investments in CCI.

BPC argues that the funds did not immediately dispose of their CCI stock in a declining market because they intended to keep CCI's stock prices at an unlawfully inflated level. There is no discernible pattern in the sales that supports such a conclusion. It may be that one of the considerations which influenced the decisions of these investors was concern for the success of CCI's exchange offer. But, even if so, the record does not establish that it was the sole or even dominant consideration. It is apparent that each investor took the course of action that it believed would minimize its losses. Some were erroneously optimistic and anticipated that CCI would be successful in its quest for control of Piper. But most sold out early. A major portion of the shares was sold before and during the CCI exchange offer, thus impairing rather than promoting its success. We conclude that the district court was not clearly erroneous in refusing to find either a scheme to boost the price of CCI stock or a purpose on the part of CCI and the funds to manipulate the market in CCI shares.

Moreover, the facts as found by the district court, which are based on sub-

37. As we stated above in our opinion in No. 72–1064, CCI had sought financing in late 1968 by selling $26 million in debentures for the express purpose of making acquisitions in the leisure-time field. CCI also had made substantial investments in Warner Bros. and Harley-Davidson before purchasing Piper shares.

stantial evidence, do not establish that an unlawful market manipulation occurred. BPC's reliance upon Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970), is misplaced. There, Crane sought to take over Air Brake by a cash tender offer. Air Brake enlisted the aid of Standard to oppose the takeover. One of the means selected by Standard to achieve this objective was manipulation of Air Brake stock. On the last effective date of the tender offer, Standard, through a series of transactions, purchased on the market an extremely large number of shares at a price above the then market price, while at the same time secretly arranging for others to purchase at a much lower price many of the shares it had acquired. It was manifest from the secret deals and the intentional loss taken by Standard that it deliberately maneuvered the market price of Air Brake stock in order to defeat Crane's tender offer.

In the instant case, unlike *Crane*, the requisite purpose and wilfullness for a market manipulation claim cannot be inferred from the established facts. BPC places unwarranted reliance on circumstantial evidence. The funds bought CCI shares because they believed that it was a wise investment. The securities laws do not proscribe all buying or selling which tends to raise or lower the price of a security. The securities laws are designed to create "investors markets where prices may be established by the free and honest balancing of investment demand with investment supply." H.R.Rep.No.1383, 73d Cong., 2d Sess. 11 (1934). So long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established. See Section 9(a)(2) of the 1934 Act, 15 U.S.C. § 78i(a) (1970).

We hold that BPC failed to prove that the funds acted from improper motive, that CCI encouraged them to do so, or that unlawful market manipulation in fact occurred.

(B) CLAIM OF ILLEGAL WAREHOUSING

BPC claims that, at the direction of CCI, Tech Fund instructed its affiliates to purchase and illegally "warehouse" Piper stock which these affiliates later tendered to CCI.

BPC bases this claim on the following facts. After CCI announced its exchange offer, it continued to purchase Piper shares on the market. On April 7, the SEC warned CCI that these purchases violated Rule 10b–6. CCI heeded this warning and ceased making purchases. On April 17 and 18, Tech Fund ordered two of its affiliates to start buying Piper stock. They acquired 14,700 shares by April 25. Of this total, 9,900 shares were tendered on June 5 to CCI pursuant to its exchange offer.

BPC argues that Tech Fund purchased these securities at the encouragement of Spencer of Mitchell, Hutchins, who supposedly acted under instructions from CCI. Tech Fund evidently did purchase the stock because it hoped to take advantage of a favorable CCI exchange offer. Tech Fund also apparently relied at least in part upon the representations of Spencer. The record, however, does not support BPC's assertion that CCI arranged this purchase by Tech Fund or that it made promises of value to Tech Fund with regard to its exchange offer.

We hold that the district court was not clearly erroneous in rejecting BPC's claim of illegal warehousing.

We have considered BPC's other claims on this appeal, such as CCI's alleged violation of Section 17(a)(2) of the Investment Company Act of 1940, 15 U.S.C. § 80a–17(a)(2) (1970), and have concluded that they are without merit.

The judgment of the district court on the appeal in No. 72–1120 is affirmed.

IV

SEC v. BANGOR PUNTA CORPORATION (NOS. 72–1053 and 72–1140)

These are cross-appeals from a judgment entered November 17, 1971 after

trial on the merits. 331 F.Supp. 1154 (S.D.N.Y.1971). The SEC appeals from those provisions of the judgment which denied a permanent injunction against further violations of the securities laws and which imposed a condition upon BPC's rescission offer to former Piper shareholders. BPC cross-appeals from those provisions of the judgment which found BPC to have violated the securities laws and which ordered BPC to offer rescission to former Piper shareholders.

The SEC brought this action pursuant to Sections 20(b) and 22(a) of the 1933 Act, 15 U.S.C. §§ 77t(b) and 77v(a) (1970), and Sections 21(e) and 27 of the 1934 Act, 15 U.S.C. §§ 78u(e) and 78aa (1970). The complaint alleged that BPC's registration statement and prospectus for its Piper exchange offer violated the registration statement and prospectus requirement provisions of Sections 7 and 10(a) of the 1933 Act, 15 U.S.C. §§ 77g and 77j(a) (1970); and the antifraud provisions of both acts, Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1970), Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5 promulgated under the 1934 Act, 17 C.F.R. § 240.10b–5 (1972).

After trial of this action at the same time as the other two actions (the subject of the appeals in Nos. 72–1064 and 72–1120), the district court concluded that BPC had violated the securities laws, including the antifraud provisions of the 1933 and 1934 Acts. The court ordered that BPC offer rescission to all former Piper shareholders who had accepted BPC's exchange offer, subject to

a condition which we shall discuss below. The court denied the SEC's request that BPC be permanently enjoined from further violations of the securities laws.

On the SEC's appeal, to the extent the judgment is appealed from, we affirm in part, and reverse and remand in part. On BPC's cross-appeal, we affirm.

(A) INJUNCTIVE RELIEF

The district court concluded that, although BPC had violated the securities laws in disseminating a materially misleading registration statement and prospectus for a securities exchange offer, nevertheless "the Commission has failed to carry its burden to establish, with persuasive evidence, that Bangor-Punta, its officers, directors and employees have *a propensity or natural inclination* to violate the securities law." (emphasis added.) Accordingly, the court denied a permanent injunction against further violations. 331 F.Supp. at 1163. I disagree.[38]

Based upon the SEC's statutory responsibility under the 1933 and 1934 Acts [39] to seek a permanent injunction "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation" of the provisions of such Acts or any rule or regulation promulgated thereunder, I believe that the district court erred in denying a permanent injunction and I emphatically dissent from the opinion of Judge Gurfein affirming the denial of such injunction. The grounds of my dissent are as follows.[40]

---

38. On this issue—the district court's denial of injunctive relief in the SEC's enforcement action—I would reverse the district court and remand with directions that it issue an injunction against further violations of the securities laws by Bangor Punta, its officers, directors and employees. But my opinion on this issue, I regret to say, has emerged as the minority view. The majority view is set forth in Judge Gurfein's separate opinion at pages 393–95, *infra*.

39. Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1970); Section 21(e) of the 1934 Act, 15 U.S.C. § 78u(e) (1970).

40. As to one finding of the district court with respect to which the SEC challenges the denial of an injunction, although the issue is a very close one, I am inclined to agree with my colleagues that the district court's finding of fact should not be set aside as clearly erroneous. Fed.R.Civ. P. 52(a); Heyman v. A. R. Winarick, Inc., 325 F.2d 584, 589 (2 Cir. 1963).

### (1) Erroneous Standard

First, the district court applied an erroneous standard in determining whether a permanent injunction should issue. The court held, as stated above, that the SEC had failed to show that "Bangor Punta, its officers, directors and employees have *a propensity or natural inclination* to violate the securities law." (emphasis added). It uniformly has been held that the correct standard is "whether there is a reasonable likelihood that the wrong will be repeated". SEC v. Manor Nursing Centers, Inc., 458 F. 2d 1082, 1100 (2 Cir. 1972).[41] See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953); SEC v. Culpepper, 270 F.2d 241, 249 (2 Cir. 1959). There is a meaningful difference between the standards of "propensity or natural inclination to violate" and "reasonable likelihood that the wrong will be repeated". The district court's failure to perceive this difference and my colleagues' sanctioning the application of an erroneous standard cuts to the core of the error committed. This leads to the second ground of my dissent.

### (2) Requirement of Intent

Second, in sanctioning a standard of "propensity or natural inclination to violate the securities laws", my colleagues have engrafted upon the standard required for an injunction in an SEC enforcement action a requirement not required by Congress, by the Supreme Court or by our Court (prior to today's

---

The SEC contends that the court erred in refusing to find that BPC had decided by the early summer of 1969 to sell its BAR holdings to Amoskeag for $5 million and chose deliberately to postpone effectuating the sale in order to avoid recording and disclosing a loss of $13 million. Upon reviewing the entire evidence with respect to this aspect of the matter, however, I agree that we are not "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). The SEC relies heavily upon the testimony of Dumaine to establish that a deal had been made prior to the close of the Piper exchange offer. The district court, which observed the demeanor of the witness, concluded that his testimony was not worthy of belief. On such a determination, I agree that we should not substitute our views for those of the trial judge who heard and saw the witness. Nor do I believe that we should find unreasonable the court's inferences drawn from undisputed evidence that BPC's delay in consummating the deal resulted from a prudent business decision to ascertain, through a complete investigation of legal and accounting ramifications before closing the deal, the precise impact of the sale.

Since the issue on this point is very close, I could well be wrong and the SEC may be correct in urging that the district court's finding was clearly erroneous. Nevertheless, for the reasons stated above, I prefer to resolve any doubt on this point in favor of the correctness of the district court's finding—especially in view of the more persuasive reasons set forth below

which in my opinion demand reversal of the district court's denial of an injunction.

41. In SEC v. Manor Nursing Centers, Inc., *supra*, we expressly *rejected* appellants' contention that "the SEC must show more than a reasonable likelihood of future violations. . . . [A]ppellants must be shown to have a propensity or natural inclination to violate the securities laws." 458 F.2d at 1101.

In *Manor Nursing*, referring to the district court's opinion below in the instant case, we assumed that "it was not purporting to apply a new standard for the issuance of an injunction" in view of the court's reliance upon our decision in SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2 Cir.), cert. denied, 404 U.S. 1005 (1971). 458 F.2d at 1101.

Since the author of the present opinion also was the author of *Manor Nursing*, I can state unequivocally that the *Manor Nursing* court was totally unfamiliar with the record in the instant case, other than the district court's opinion reported at 331 F.Supp. 1154; and of course, as with Judge Pollack when he denied the permanent injunction in the instant case, we did not know at the time of our decision in *Manor Nursing* that the conduct of Bangor Punta here ultimately would be held, as we now hold, to constitute serious violations of the antifraud provisions of the federal securities laws—including such conduct as recklessly failing to disclose in its registration statement and prospectus the true value of the BAR: hardly a minor omission, but a $13 million one.

decision), namely, a *purposeful* violation of the securities laws and a showing of *intent*. In Judge Gurfein's words (p. 394 *infra*), "In the last analysis we are dealing with *intent* . . . . " (emphasis added). I disagree.

To impose upon the SEC the burden of showing evil motive or intent to violate the securities laws as a condition to obtaining an injunction against further violations would be tantamount to converting a civil injunction enforcement proceeding into a criminal prosecution. As the Supreme Court said in reversing our Court in SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963): [42]

"This, of course, is but another way of putting the rejected argument that the elements of technical common-law fraud—particularly intent—must be established before an injunction requiring disclosure may be ordered. It is the practice itself, however, with its potential for abuse, which 'operates as a fraud or deceit' within the meaning of the Act when relevant information is suppressed. . . . Failure to disclose material facts must be deemed fraud or deceit within its intended meaning, for, as the experience of the 1920's and 1930's amply reveals, the darkness and ignorance of commercial secrecy are the conditions upon which predatory practices best thrive. To impose upon the Securities and Exchange Commission the burden of showing deliberate dishonesty as a condition precedent to protecting investors through the prophylaxis of disclosure would effectively nullify the protective purposes of the statute." 375 U.S. at 200.

The absence of any such requirement of intent for an injunction under Section 20(b) of the 1933 Act or Section 21(e) of the 1934 Act is borne out by the provision in each section, immediately following the authorization for the SEC to seek an injunction, empowering "[t]he Commission [to] transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings. . . ." 15 U.S.C. §§ 77t(b) and 78u(e) (1970). In short, Congress itself has made separate provision for the SEC to institute civil injunction proceedings on the one hand, and to submit criminal reference reports to the Attorney General on the other hand; a showing of intent clearly is required for the latter, and equally clearly not required for the former.

(3) *Injunction to Protect Public Interest*

Third, the district court totally failed to recognize that an injunction in an SEC enforcement proceeding is sought to protect public rather than private interests. Doubts as to whether an injunction sought in such a proceeding is necessary to safeguard the public interest should be resolved in favor of granting the injunction. See United States v. First National City Bank, 379 U.S. 378, 383 (1965); Mitchell v. Pidcock, 299 F. 2d 281, 287 (5 Cir. 1962). As Judge Smith recently observed, there is a vital distinction between the function of a district court in determining whether to issue an injunction in an action between two private litigants and its function in an action by a government agency seek-

---

42. *Capital Gains* involved the showing the SEC was required to make in order to obtain an injunction compelling disclosure under the Investment Advisers Act of 1940. The Court held that "Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' . . . did not intend to require proof of intent to injure . . . . Congress intended [the Act] to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes." 375 U.S. at 195.

This applies a fortiori to the remedial injunctive provisions of the 1933 and 1934 Acts pursuant to which the SEC brought the instant injunction action. See note 39 *supra*.

ing an injunction to enforce an Act of Congress:

> "But the function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants . . . .
>
> The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained . . . ."

United States v. Diapulse Corporation of America, 457 F.2d 25, 27–28 (2 Cir. 1972).

Not only did the district court fail to recognize this vital distinction between an injunction sought in an SEC enforcement action to protect the public interest and one sought to protect private interests in private litigation, but my colleagues appear also to have misapprehended the distinction.[43]

### (4) *BPC's Past Violations*

Fourth, the primary factor in deciding whether past violations, now terminated, constitute a proper basis upon which to find a reasonable likelihood that defendants will commit further violations is the nature of the past viola-

tions. SEC v. Manor Nursing Centers, Inc., *supra*, 458 F.2d at 1100–01; SEC v. Culpepper, *supra*, 270 F.2d at 250; United States v. W. T. Grant Co., *supra*, 345 U.S. at 633.

To me, nothing could be clearer than the fact that BPC's omissions from its registration statement and prospectus—again, not minor omissions, but including a $13 million one—constituted violations of the securities laws of the most flagrant character. It was inevitable that a large loss would occur and that such loss would have an enormous impact on a company of BPC's size and character. See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2 Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976 (1969).

The district court found that such omissions were materially misleading. It nevertheless concluded that BPC did not *intentionally* or *purposefully* mislead and did not act in *bad faith*. It therefore denied the injunction. In my view, this was clearly erroneous.

On the basis of the district court's own findings, it follows as the day the night that BPC's actions were sufficiently culpable to portend that similar violations would occur in the future. A duty is imposed by law upon persons

---

43. For example, Judge Mansfield concludes his dissenting opinion thus (p. 406, *infra*):

> " . . . I am convinced that a judgment which (1) awards compensatory damages to CCI, (2) bars BPC from voting its illegally acquired Piper shares, and (3) awards rescission to former Piper stockholders who exchanged their shares in response to BPC's tender offer, amply protects the public interest and insures against any reasonable likelihood that BPC will engage in similar conduct in the future."

Such a notion that, once private interests in separate but related litigation have been resolved, the public interest is ipso facto protected and the need for an injunction in a separate SEC enforcement action is ipso facto eliminated, is a concept I find difficult to grasp. Surely it is a far cry from Judge Smith's perceptive recognition of "the function of a court in deciding whether to issue an in-

junction authorized by a statute of the United States to enforce and implement Congressional policy".

See also Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687, 699 (2 Cir. 1973), where our Court in a private injunction action on March 12, 1973, in unanimously affirming the district court's grant of a preliminary injunction which enjoined consummation of a tender offer because of alleged violations, inter alia, of Section 14(e) of the 1934 Act, stated:

> "Therefore, as in actions brought by the government, doubts as to whether an injunction sought is necessary to safeguard the public interest—when the public interest involved is as clear, pervasive and vital as the record here demonstrates—should be resolved in favor of granting the injunction. See United States v. First National City Bank, 379 U.S. 378, 383 (1965); Mitchell v. Pidcock, 299 F.2d 281, 287 (5 Cir. 1962)."

issuing securities to make a careful judgment as to what information a reasonable investor requires. BPC's management was aware of the circumstances indicating that the book value of the BAR was unrealistic. Cf. SEC v. Great American Industries, Inc., 407 F.2d 453, 456–60 (2 Cir. 1968) (en banc), cert. denied, 395 U.S. 420 (1969); Heit v. Weitzen, 402 F.2d 909 (2 Cir. 1968), cert. denied 395 U.S. 903 (1969). Nondisclosure of facts of a similar nature long has been condemned under the federal securities laws. BPC may not be heard to claim that its conduct in question had not been clearly declared unlawful prior to the instant suit. Cf. SEC v. Keller Corp., 323 F.2d 397 (7 Cir. 1963).

Furthermore, BPC's misleading omissions from its registration statement and prospectus were made in the teeth of a consent decree which had been entered in the District Court for the District of Columbia on May 26, 1969 enjoining BPC from publicizing its exchange offer prior to filing a registration statement in compliance with "the registration provisions of the Federal securities laws." We recently have held that "[i]t was entirely proper to issue an injunction" when, inter alia, "appellants continued to violate the federal securities laws even after a consent decree had been entered enjoining them from such conduct." SEC v. Koenig, 469 F.2d 198, 202 (2 Cir. 1972).

Also here, as in *Koenig,* BPC and its named officers "have persisted in their contention that their past conduct was not improper". 469 F.2d at 202. This is another factor which was not taken into account, but should have been, by the district court in assessing the need for a permanent injunction. SEC v. Manor Nursing Centers, Inc., *supra,* 458 F.2d at 1101; SEC v. MacElvain, 417 F.2d 1134, 1137, (5 Cir. 1969), cert. denied, 397 U.S. 972 (1970); Hecht Co. v. Bowles, 321 U.S. 321, 331 (1944).

### (5) *BPC as a Conglomerate*

Fifth, where violations of the securities laws have been committed in the past by a corporation through its officers, the nature of the corporation and its officers is an important consideration in determining the likelihood of further violations. See SEC v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1306; SEC v. Mono-Kearsarge Consol. Mining Co., 167 F.Supp. 248, 261 (D.Utah 1958). BPC is a conglomerate with holdings in diversifield fields. It long has been interested in new acquisitions. Tender offers of the type involved in this litigation are becoming a popular means of achieving acquisitions. There is a reasonable likelihood that BPC will become involved in similar tender offers in the future. Such involvement is likely also to entail more battles for control.[44] As we observed in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2 Cir. 1969), contests for control often are heated engagements in which both sides will resort to any means to achieve victory. It is when the temptation to violate the law

44. Judge Gurfein's observation, "Nor do we believe that a conglomerate should be more harshly judged that others" (p. 395 *infra*), strikes me as missing the point. I do not suggest that BPC be judged by any different *standard* than others. What I do say, as the cases hold, is that the *nature of a corporation* which has committed flagrant violations of the securities laws in the past has an important bearing upon the likelihood of recurrence of such violations. Any judge who has been required to study in depth the operations, and particularly the acquisitions, of a major conglomerate, knows that tender offers are an integral part of their way of life. See United States v. International Telephone & Tel. Corp., 306 F.Supp. 766 (D.Conn.1969), and 324 F.Supp. 19 (D.Conn.1970), appeal dismissed, 404 U.S. 801 (1971). And any realistic estimate of the conduct of participants such as BPC and its officers in a tender offer contest, *based on their past performance in such a contest,* will acknowledge that "[t]hey act quickly, sometimes impulsively, often in angry response to what they consider, whether rightly or wrongly, to be low blows by the other side." Electronic Specialty Co. v. International Controls Corp., *supra,* 409 F.2d at 948.

is strongest that the greatest deterrence is necessary.

## (6) *Abuse of Discretion*

Sixth, Judge Gurfein's opinion emphasizes that the standard for reviewing the district court's denial of injunctive relief is whether there was an abuse of discretion. I agree.

I stand four square on what I said in SEC v. Manor Nursing Centers, Inc., *supra*:

"In an action, such as the instant one, where the SEC sought injunctive relief under Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1970), and under Section 21(e) of the 1934 Act, 15 U.S.C. § 78u(e) (1970), a district court has broad discretion to enjoin possible future violations of law where past violations have been shown, and the court's determination that the public interest requires the imposition of a permanent restraint should not be disturbed on appeal unless there has been a clear abuse of discretion. SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1306–07 (2 Cir.), cert. denied, 404 U.S. 1005 (1971); SEC v. Culpepper, 270 F.2d 241, 250 (2 Cir.1959). *Moreover, the party seeking to overturn the district court's exercise of discretion has the burden of showing that the court abused that discretion, and the burden necessarily is a heavy one.* SEC v. Culpepper, *supra*, 270 F.2d at 250; United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).

In the instant case, we hold that appellants have not sustained that burden, for the record amply supports the district court's conclusion that the issuance of a permanent injunction was appropriate." (emphasis added) 458 F.2d at 1100.

Of course, our appellate review in *Manor Nursing* was addressed to the *grant* of an injunction in an SEC enforcement proceeding. Here we are reviewing the *denial* of such an injunction. Our scope of review would appear to be different. As Judge Waterman stated in NMU v. Commerce Tankers Corp., 457 F.2d 1127 (2 Cir. 1972): [45]

"Were this an appeal from the *grant* after an evidentiary hearing of [an] injunction our scope of inquiry could be limited by the 'clearly erroneous' test. However, when the appeal is from the *denial* of a petition for [an] injunction, it seems that, in light of the congressional policy favoring the grant of such injunctions in appropriate circumstances, our scope of review ought not to be so limited." (emphasis that of the Court) 457 F.2d at 1133–34.

In any event, whatever abuse of discretion standard be applied, in my view the district court's denial of an injunction here was a plain abuse of discretion —even on the record then before the court.[46] And surely, in view of our decision today holding that BPC's conduct constituted flagrant violations of the antifraud provisions of the federal securi-

---

45. *Commerce Tankers* involved the denial of an injunction authorized pursuant to an Act of Congress, i. e. Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*) (1970).

46. Judge Grufein refers to "the experienced trial Judge below . . . a trial judge experienced in the securities field." I agree that Judge Pollack is indeed a trial judge thoroughly experienced in this field. And I yield to no judge on our Court in my firm belief that a district judge's exercise of discretion should not be reversed absent a clear showing of abuse; the record of decided cases in our Court bears this out.

But it does strike me that all of this begs the question. After more than a dozen years on the federal bench—mostly as a district judge—I have never discerned any notable reticence on the part of federal appellate judges about reversing a district judge upon a showing of abuse of discretion. Indeed, the benchmark of a truly competent district judge—as with Judge Pollack in the instant case—is his capacity to insure that the record demonstrates with crystal clarity the basis of his exercise of discretion, so that a reviewing court can determine abuse or the absence of abuse.

ties laws—a holding of course unknown to the district court when it denied the permanent injunction—it would seem to me that at the very least we should remand the case to the district court, as we did in SEC v. Texas Gulf Sulphur Co., *supra,* "for a further determination below, in the light of the approach explicated by us in [our opinion filed today] as to whether, in the exercise of its discretion, the injunction against [BPC] which the Commission seeks should be ordered." 401 F.2d at 864.

### (7) *Mischievous Precedent*

Finally, today's judgment and opinion by the majority of this panel affirming the denial of a permanent injunction in this SEC enforcement action, in my opinion, will cause mischief in the enforcement of the federal securities laws.

The decision undercuts the strong policy of this Court of encouraging vigorous enforcement of the securities laws. Its radiations will have their impact beyond this Circuit, since other courts look to us for guidance in this area.

In my view, no decision during the four decades the federal securities laws have been on the books will more effectively cripple the salutary enforcement program of the Securities and Exchange Commission than today's 2–1 decision by the majority of this panel on this issue.

I therefore respectfully but most emphatically dissent from the denial of a permanent injunction.

I would hold that the district court erred in denying the SEC's request for a permanent injunction against further violations of the securities laws; and I would remand with directions that the district court issue such an injunction.

### (B) RESCISSION ORDER

The district court concluded that BPC would be required to make an offer of rescission to former Piper shareholders who accepted the BPC exchange offer. It directed the parties to submit an appropriate decree for the court's consideration. 331 F.Supp. at 1162.

The decree as entered provided, among other conditions not contested on appeal, that if the rescinding Piper shareholder previously had sold the BPC securities received in the exchange offer, he must tender to BPC—in addition to the amount of securities he received plus dividends and interest paid (or due and payable) thereon—a cash payment equal to the excess, if any, of his sales proceeds from the original BPC securities over his cost of repurchasing the substitute BPC securities which he tenders to BPC. Both parties on appeal challenge the rescission order but for different reasons.

Before considering the propriety of the district court's order, we must decide whether a federal district court has the power, at the request of the SEC, to order rescission or restitution. The SEC has no express statutory authority to seek rescission, restitution, or other forms of equitable monetary relief. The Commission, however, may institute an action for injunctive relief and, once the equity jurisdiction of the district court has been properly invoked, the court has power to grant all equitable relief necessary under the circumstances. SEC v. Manor Nursing Centers, Inc. *supra,* 458 F.2d at 1103–04, and authorities there cited. See generally 1 Pomeroy, Equity Jurisprudence § 236a (5th ed. 1941). As the Supreme Court said in an analogous situation:

> "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief *in light of the statutory purpose.*" Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291–92 (1969). (emphasis added).

Accord, SEC v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 1307–08. Ancillary relief contributes to effective enforcement of the securities laws by depriving defendants of gains made through violations, by deterring future

violations, and by increasing the overall efficiency of Rule 10b–5 and similar actions. See generally Note, Ancillary Relief in SEC Injunction Suits for Violation of Rule 10b–5, 79 Harv.L.Rev. 656 (1966). Accordingly, we hold that the SEC can seek ancillary equitable relief where, as in the instant action, it is necessary to effectuate the statutory purpose.

 BPC challenges the rescission order on the ground that a former Piper shareholder who has disposed of the BPC securities he received on the exchange offer should not be eligible for rescission. It argues that, since a Piper shareholder so situated could not obtain rescission if he brought the action himself, the SEC should not be permitted to seek rescission for him. The defect in this argument is that a Piper shareholder could purchase substitute shares and demand rescission if he brought his own rescission action. BPC maintains that a shareholder can sue only under § 11 or § 12(2) of the 1933 Act and that neither of those provisions permits rescission where the plaintiff no longer holds the shares. We need not decide whether BPC's interpretation of these provisions is correct because a defrauded shareholder also can bring suit for rescission and restitution under § 10b of the 1934 Act, Errion v. Connell, 236 F.2d 447 (9 Cir.1956), or under § 29(b) of the 1934 Act, Geismar v. Bond & Goodwin, Inc., 40 F.Supp. 876 (S.D.N.Y.1941). Although the issue appears not to have been resolved, it is reasonable to assume with respect to such claims that a shareholder seeking rescission, even if he has disposed of his shares, should be permitted to tender substitute shares. See Restatement of Restitution § 66(4) (1937); 3 Loss, Securities Regulation 1792–93 (2d ed. 1961, Supp.1969). Furthermore, the SEC requests this rescission order not merely to compensate

Piper shareholders for their loss but also to implement the broader statutory purpose of protecting the public interest through effective enforcement of the securities laws. Limitations on the relief available in actions brought by private parties are not necessarily applicable to SEC enforcement proceedings. We hold that the district court was correct in permitting former Piper shareholders who had disposed of the BPC securities received on the exchange offer to tender substitute shares.

 The SEC challenges the condition of the rescission order that requires a tendering Piper shareholder to return any profit he may have realized from the sale of his BPC securities and the purchase of substitute shares on the present market at a lower price. It is true that a prerequisite to the remedy of restitution is that a party seeking rescission must return any proceeds he has received from the transaction being rescinded in order to be placed in status quo ante. Mott v. Tri-Continental Financial Corp., 330 F.2d 468, 470–71 (2 Cir.1964). But the "proceeds" that must be returned are those received as consideration from the other party. That does not necessarily include profits realized from an interim sale resulting from fortuitous events which occurred subsequent to the transaction. It would be inequitable to require the tender of these profits where, as here, the other party is not required concomitantly to underwrite losses. The effect of the condition imposed by the district court is to render ineffective the rescission remedy.[47]

 We hold that the district court erred in imposing the condition requiring restitution of interim profits; and we remand with directions that the judgment be modified by deleting that condition from the rescission order.

---

47. There can be no expectation that the Piper shareholders will tender unless the market for their shares upon rescission is an open and free one. Such a market cannot exist where the price to be paid for the assignment of a right by each individual Piper shareholder is subject to different fact situations.

On its cross-appeal, BPC argues with regard to its exchange offer that it did not fail to disclose facts which a reasonably prudent investor would deem to be material. We have dealt with this issue at length in our opinion above in Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, et al. (No. 72–1064). Our decision on this issue there is conclusive here.

On the SEC's appeal in No. 72–1053, to the extent the judgment is appealed from, we affirm in part, and reverse and remand in part. On BPC's cross-appeal in No. 72–1140, we affirm.

## SUMMARY

The following is a summary of our essential holdings in each of the three appeals.

In CHRIS–CRAFT INDUSTRIES, INC. v. PIPER AIRCRAFT CORPORATION, ET AL. (No. 72–1064), we hold that:

(1) Chris-Craft has standing under the antifraud provisions of § 14(e) of the 1934 Act to sue defendants for damages.

(2) The record establishes violations of § 14(e) on the part of all defendants, i.e. the Piper family defendants (not the Piper Aircraft Corporation); Bangor Punta Corporation and its named officers; and the First Boston Corporation and its named officers.

(3) Under appropriate principles of causation, the acts and conduct of each of the defendants in violation of § 14(e) caused injury to Chris-Craft for which it is entitled to be compensated.

(4) Chris-Craft also is entitled to recover damages from Bangor Punta for the injury caused by Bangor Punta's cash purchases of large blocks of Piper stock during the pendency of Bangor Punta's exchange offer for Piper shares, in violation of Rule 10b–6 under the 1934 Act.

(5) The judgment of the district court dismissing the complaint is reversed and the case is remanded with directions to enter judgment awarding damages and equitable relief in accordance with our opinion.

In BANGOR PUNTA CORPORATION v. CHRIS–CRAFT INDUSTRIES, INC. (No. 72–1120), we hold that:

(1) Bangor Punta failed to prove its claim of unlawful market manipulation of Chris-Craft stock.

(2) Bangor Punta failed to prove its claim of illegal warehousing of Chris-Craft stock.

(3) The judgment of the district court dismissing the complaint is affirmed on the ground that Bangor Punta failed to adduce sufficient evidence to support its claims that Chris-Craft violated the securities laws or that such violations caused injury to Bangor Punta.

In SEC v. BANGOR PUNTA CORPORATION (Nos. 72–1053 and 72–1140), to the extent the judgment is appealed from, we hold that:

(1) The district court did not err in denying the SEC's request for a permanent injunction against further violations by Bangor Punta of the securities laws.

(2) The district court erred in imposing, as a condition to its order that Bangor Punta offer rescission to all Piper shareholders who had accepted Bangor Punta's exchange offer, the requirement that such shareholders make restitution of any interim profits realized by them on the sale of their Bangor Punta securities; and the case is remanded with directions that the judgment be modified by deleting that condition from the rescission order.

(3) On Bangor Punta's cross-appeal, we affirm the judgment of the district court.

GURFEIN, District Judge (concurring).

I concur generally in Judge Timbers' scholarly opinion except as to the injunction sought by the SEC.

In view of the apparent disparity between the views of my brothers I respectfully comment on some of the points raised.

## STANDING

With respect to standing I am inclined to agree with Judge Mansfield that there is no constitutional question. My approach is, moreover, much closer to Judge Pollack's though I disagree with his conclusion. It seems to me he was right in approaching the problem as one of causation before considering the question of standing. If there is no causation standing becomes a rather abstract conception. Since the seven per cent illegally acquired by BPC caused it to win the contest, the loser has standing. I think it unnecessary to say that a defeated contender who won a booby prize of say, one per cent of the stock, would have standing simply because he entered the lists and lost.

## SCIENTER AND CAUSATION

I agree that some kind of scienter must be shown. But I do not think a litmus paper test of scienter will ever be found. I am content to accept the general formulation that mere negligence will not suffice in a private action for money damages and that "recklessness that is equivalent to wilful fraud," SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 868, 2 Cir. (Friendly, C. J. concurring), is required for a violation of Section 14 (e) as well as of Section 10(b). In modern times statutory construction grows case by case much as the common law did when more general rules of law were involved. And I venture to say that stability may be more easily attained by analogizing from decided cases whose facts are known than by guessing what may come within some general rule which must of necessity be inchoate if only for want of the gift of prophecy.

## RULE 10b–6

With respect to the Rule 10b–6 violation I limit my concurrence to agreement that there was such a violation as we held in Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 576–577 (2 Cir.1970), and would hold that since the block purchases were necessary for control causation was established. I do not think we are required in this case to pass more precisely on the general question whether a purchase off the market that does not affect the tape causes price fluctuations and damage simply because it is a violation of Rule 10b–6. On that question Judge Pollack, in my respectful submission, was right.

## SECURITIES AND EXCHANGE COMMISSION, PLAINTIFF–APPELLANT–APPELLEE V. BANGOR PUNTA CORPORATION, DEFENDANT–APPELLEE–APELLANT

## INJUNCTIVE RELIEF

Judge Mansfield and I do not agree that Judge Pollack's denial of injunctive relief to the SEC against BPC should be reversed. We respectfully suggest that the matter is not so clear that we should substitute our judgment for the judgment of the experienced trial Judge below who sat as a chancellor in equity. He heard the witnesses and had the opportunity by observation better to prophesy future conduct than we can on this printed record.

The days are long since past when appellate courts in the federal system in equity cases reviewed findings of fact *de novo*. The scope of appellate review is more sharply limited even in causes that would have been formerly classed as proceedings in equity. The findings of the trial Court must be clearly erroneous or they will not be set aside. Fed.R.Civ.P. 52(a).

Specifically, the test for review of the denial of injunctive relief is whether there has been an abuse of discretion. See United States v. W. T. Grant Co., 345 U.S. 629, 633, 634, 73 S. Ct. 894, 97 L.Ed. 1303 (1953). In United States v. W. T. Grant Co. the Supreme Court said that for reversal "the Government must demonstrate that there was no reasonable basis for the District Judge's decision." 345 U.S. at 634, 73 S.Ct. at 898. And this Court has recognized that this rigorous limitation on appellate review applies to SEC actions for injunctive relief as well. As was said in SEC v. Manor Nursing Centers Inc., 458 F.2d 1082, 1100 (2 Cir. 1972), "the party seeking to overturn the district court's exercise of discretion has the burden of 'showing that the court abused that discretion, and the burden necessarily is a heavy one.' SEC v. Culpepper, *supra,* 270 F.2d [241] at 250; United States v. W. T. Grant Co., 345 U.S. 629, 633, [73 S.Ct. 894, 97 L. Ed. 1303] (1953)." I think we lose sight of these accepted principles if we reverse and order the issuance of a permanent injunction in this case.

Here Judge Pollack found against the SEC on its primary contention. He found that there was no purposeful withholding of the completion of the Dumaine negotiation until the contest for Piper was over. 331 F.Supp. 1154 at 1160. We cannot set this finding aside as clearly erroneous on this record. This is a weighty finding by a trial Judge experienced in the securities field. In the last analysis we are dealing with intent and must seek to determine whether there is a likelihood of recurrence of unlawful activity and a need for a prophylatic against recidivism. Who is better able to determine such things than the Judge who saw and heard the witnesses and got the feel of what happened?

In the opinion in the other cases decided today, we accept the District Court's "inferences drawn from undisputed evidence" that the delay in consummating the deal resulted from a prudent business decision to investigate the legal and accounting impact of the sale.

Judge Timbers argues that there is a "core" difference between the standard of "a propensity or natural inclination to violate the securities law" attributed to Judge Pollack, and the test offered by Judge Timbers' opinion "whether there is a reasonable likelihood that the wrong will be repeated." Of course the statute expresses it as "any person [who] is engaged or about to engage in any acts or practices which constitute or will constitute a violation." The use of either test, if indeed they differ except in verbiage, is not the subject of immutable statutory command. We do not see sufficient difference in the standards juxtaposed to find that the District Court erred as a matter of law. Indeed, if one wished to be finicky, Judge Timbers' formulation is the more limited—"*the* wrong will be repeated" implying a rather narrowly repetitive violation while the propensity standard covers a multitude of violations (emphasis supplied). We emphasize that we are not in the least interested in limiting the basis for an SEC injunction as a matter of general rule.

The dissent also misinterprets our view on intent. We are not limiting our injunctive relief to common law fraud as is implied from the citation of SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1968). Nor are we eliminating reckless conduct that may be tantamount to culpable negligence from the proper basis for injunctive relief at the instance of the Commission. Nor do we treat as unimportant the public interest as is suggested.

Since we do not deny that in a proper case even sustained recklessness can be the basis for injunctive relief there is no such divergence of opinion in the abstract as Judge Timbers suggests. We repeat that we are not the finders of fact. The impact of our decision is, by its terms, limited to the scope of appellate review.

In *Texas Gulf Sulphur, supra,* this Court simply remanded "the cause as to it [Texas Gulf Sulphur Company] for a further determination *below,* in the light of the approach explicated by us in the foregoing opinion, as to whether in the exercise of *its* discretion, the injunction against it which the Commission seeks should be ordered" (emphasis supplied). And as Chief Judge Friendly said in concurring: "Absent much clearer language than is found in the 1934 Act, the entitlement of a plaintiff to an injunction thereunder remains subject to principles of equitable discretion." He pointed out that Judge Bonsal had acted on the erroneous belief that "no violation of the Rule had occurred and he was thus without power to enjoin," but Chief Judge Friendly wrote: "If Judge Bonsal had denied an injunction on these grounds [i. e. 'no danger of repetition'], I see no basis on which we could properly have reversed him." 401 F.2d at 869.

 In the instant case the District Judge found that the omission in the registration statement was material, but in his discretion, considering the public interest, he did not enjoin because he did not believe there was likelihood of recurrence. 331 F.Supp. at 1162–1163. We do not consider that to be such an abuse of discretion as to support reversal. And "abuse of discretion" it would have to be. See *Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

Nor do we believe that a conglomerate should be more harshly judged than others. The issue is not whether it will seek other acquisitions but rather how it will go about doing them.

In any event sanctions need not be cumulative. Damages tend to have a didactic effect. The SEC has, through our decision in the companion cases now largely achieved its commendable purpose. Further to enjoin we think would be to add yet another star to the flag of a battle already won. The denial of an injunction is affirmed.

MANSFIELD, Circuit Judge (concurring and dissenting):

I concur in those results reached in Judge Timbers' opinion which represent the majority opinion as to issues other than injunctive relief, except that I dissent from the reversal of the district court's dismissal of CCI's suit against the Piper family defendants.

I also concur in Judge Gurfein's opinion to the extent that it represents the majority decision affirming the denial of injunctive relief.

With due respect for my brother Timbers' exhaustive analysis of these complicated cases in his opinion ("main opinion" herein), I find myself in disagreement with some of his conclusions and reasoning. I would also limit our discussion to those legal principles necessary for adjudication of the issues presented rather than engage in unnecessary dicta in this sensitive area. The Supreme Court has urged that judicial construction of the anti-fraud provisions of the federal securities laws be limited to what is essential for the decision at hand:

"Although § 10(b) and Rule 10b–5 may well be the most litigated provisions in the federal securities laws, this is the first time this Court has found it necessary to interpret them. We enter this virgin territory cautiously. The questions presented are narrow ones. They arise in an area where glib generalizations and unthinking abstractions are major occupational hazards. Accordingly, in deciding this particular case, remembering what is not involved is as important as determining what is. With this in mind, we turn to respondents' particular contentions." SEC v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969).

Several points discussed in Judge Timbers' opinion, while interesting, strike me as both irrelevant to the issues and as a source of possible confu-

sion to readers. Other observations go much further than is necessary. With still others I must respectfully disagree. For these reasons I find it necessary to state my own differing views in this area. In doing so I shall follow the sequence of the main opinion.

### Function of Private Damage Suits

I agree that the anti-fraud and anti-manipulation sections of the federal securities laws were designed to insure against distortion and falsity in the purchase and sale of securities, and that private damage suits based upon violation of those laws should be encouraged as a means of supplementing governmental action in the vigorous enforcement of those laws. See J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1172–79 (1965); Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum. L.Rev. 12; Lowenfels, Private Enforcement in the Over-the-Counter Securities Markets; Implied Liabilities Based on NASD Rules, 51 Cornell L.Q. 633 (1966). However, it is unrealistic and fanciful to suggest that through such suits "society can obtain the maximum amount of its preferred goods and services that our resources can produce."

Full disclosure may go far toward achieving a fair and honest marketplace for trading of securities. But honesty cannot be equated with efficiency in the use of funds or assets realized from a public issue or tender offer. One need only look at the dockets of our federal district courts to appreciate that bankruptcies of honest entrepreneurs are all too common.

### CCI's Standing

With due respect for the views of the author of the main opinion, the issue before us is not whether "CCI has standing in a constitutional sense." If that were the issue, it could be settled by a one-line reference to the Supreme Court's decision in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970). The issue is one of statutory construction: Does § 14(e) confer standing upon a defeated competitor for control to sue the successful party for damages based on its violation of the anti-fraud provisions of the securities acts?

The federal securities laws are silent on the subject of a private party's standing to sue. Indeed, neither § 14(e) nor § 10(b) or Rule 10b–5 state that purchasers, sellers, or exchangers of securities have the right to sue. However, their implied standing to sue has long since been judicially established, Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946). I would recognize CCI's standing solely on the ground that vigorous enforcement of the anti-fraud provisions through private litigation, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), calls for similar implication of a private right of action in favor of a defeated contestant against the successful bidder for control for damages caused by the latter's violation of that section, see Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U. S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970), especially in view of our willingness to permit the target corporation to seek relief against the offeror under § 14(e). Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969); Butler Aviation International Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2d Cir. 1970).

### Scienter

It is generally agreed in this Circuit that some form of scienter is required to support a private damage claim based upon a violation of Rule 10b–5, compare SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 855, 863, 866–868 (Friendly, Ch. J., concurring) (2d Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756 (1969), with Globus v. Law

Research Service, Inc., 418 F.2d 1276, 1290 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), and while less than the specific fraudulent intent required to prove common law fraud will suffice, mere negligence is not enough, Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971).[1] No reason has been advanced for a different standard in the enforcement of § 14(e), the language of which is substantially the same as that found in § 10(b) and Rule 10b–5.

In the present case, although an intent to defraud has not been shown, defendants' conduct amounted to more than mere negligence. Our answer to the question of whether the proof was sufficient to satisfy the *scienter* requirement depends, therefore, upon the standard that is to govern the gray area between the extremes of specific fraudulent intent, on the one hand, and mere negligence; on the other. In my view that standard cannot be satisfactorily described in such abstract terms as "culpability," a generality frequently associated with any blameworthy or even criminal conduct, see I Working Papers of the National Committee on Reform of Federal Criminal Laws 123 (July 1970), much less as "fraud," "constructive fraud," "bad faith" or various gradations of "recklessness."

If there is to be a meaningful *scienter* standard, it should, if possible, be stated in more specific terms. Of course it might vary according to the existence of a fiduciary relationship, the burden of proof and the nature of the relief sought.[2] It might also take into account the nature and duties of the corporate posts held by the defendants, whether they are insiders or outsiders, and

whether they are active or inactive participants. See generally Mann, Rule 10b–5: Evolution of a Continuum of Conduct to Replace the Catch Phrases of Negligence and Scienter, 45 N.Y.U.L. Rev. 1206 (1970). However, if we are unable to state a standard with some degree of precision, we should frankly confess that the only method of describing the element of *scienter* is by illustration rather than by categorization or rule of general application. See, e. g., Bucklo, Scienter and Rule 10b–5, 67 Nw.U.L. Rev. 562, 568 (1972). *Scienter,* like obscenity, would then simply be something recognized when seen, but not otherwise definable. Cf. Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L. Ed.2d 793 (1964) (Stewart, J., concurring) ("I shall not attempt further to define the kinds of material. . . . But I know it when I see it. . . ."). But I believe that an applicable *scienter* rule can be formulated and defined.

Congress' use of the words "fraudulent," "deceptive" and "manipulative" in § 14(e), when coupled with the partially similar language and the legislative history of the earlier-enacted § 10(b), indicates that its purpose was not to punish mere negligence, see S.Rep. 792, 73d Cong., 2d Sess. 6 (1934), Kohn v. American Metal Climax Inc., 458 F.2d 255, 79–280 (3d Cir. 1972) (concurring and dissenting opinion of Adams, J.), but that the law was aimed at misrepresentations or omissions involving *some degree of awareness* on the part of the corporate officer charged. If Congress had intended to impose absolute liability, subject to a "due diligence" or "good faith" defense, it could have used language similar to that found in § 11 of

---

1. See VI L. Loss, Securities Regulation 3883–88 (Supp. to 2d ed. 1969).

2. We have indicated that the *scienter* requirement in suits for injunctive relief may be less strict than that in damage actions. Mutual Shares Corporation v. Genesco Inc., 384 F.2d 540, 547 (2d Cir. 1967); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 863 (per Waterman, J.),

866–868 (Friendly, J., concurring) (2d Cir. 1968), cert. denied sub nom. Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); SEC v. Great American Industries Inc., 407 F.2d 453, 463 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969) (concurring opinion of Kaufman, J.).

the 1933 Act. If, on the other hand, it had intended to limit liability to willful and intentional misrepresentation, it could have used language similar to that found in § 9(e) of the 1934 Act, 15 U.S.C. § 78i(e) (making liable any person who "willfully participates" in the sale of securities, *inter alia*, through use of materially false or misleading statements, § 9(a)(4)). The words "manipulative," "deceptive," and "fraudulent," as applied to statements or omissions, seem to have been intended to have a meaning similar to that later ascribed to them by the Commission, which has defined misleading statements or omissions as those "made with knowledge or reasonable grounds to believe that [they are] untrue or misleading," 17 C.F.R. § 240.15c 1–2(b).

When §§ 10b and 14(e) are viewed against the entire background and purpose of the securities laws, the *scienter* requirement would be satisfied upon a showing that the person charged knew the material facts misstated or omitted and could reasonably have been expected to appreciate their significance, see Heit v. Weitzen, 402 F.2d 909, 914 (2d Cir. 1968), or, if he did not know them, that he had reasonable cause to believe that there might be a material failure in disclosure and yet did not ascertain and disclose the facts even though he could have done so without any undue effort. In short, the *scienter* requirement would be met if the corporate officer (1) knew the essential facts and failed to disclose them, or (2) failed or refused, after being put on notice of a possible material failure in disclosure, to apprise himself of the facts under circumstances where he could reasonably have ascertained and disclosed them without any extraordinary effort.

In keeping with the broad remedial aims of the anti-fraud provisions of the federal securities laws such a standard of responsibility, while requiring proof of more than mere negligence, would not permit top corporate officers and those aiding and abetting them to escape liability by pleading ignorance where it can be shown that red flags putting them on notice or providing warning signals of either undisclosed or misrepresented facts of a material nature were readily apparent to all and that a routine check would have disclosed the misrepresentation. Such a test would also serve to differentiate §§ 14(e), 10(b) and Rule 10b–5 and § 17(a) of the 1933 Act, 15 U.S.C. § 77q, see SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 867 (Friendly, Ch. J., concurring), on the one hand, from other provisions of the securities acts, such as §§ 11, 12(1), 12(2), 15 U.S.C. §§ 77k, 77*l*(1), (2), which impose upon persons charged the burden of proving "due diligence," see Escott v. Barchris Construction Corp., 283 F.Supp. 643, 682–703 (S.D.N.Y. 1968).

Since the defendants in the present case had knowledge of the material facts misstated or omitted or had sufficient notice of possible misstatements' and could reasonably have ascertained the facts with a minimum of effort, the proof clearly satisfies the standard.

The majority opinion gives lip service to the foregoing test but adds a series of qualifications and characterizations that in my view are unnecessary and only serve to cast doubt upon the standard itself. The effect is to compound existing confusion as to the law in the area. Starting with the view that proof of *scienter* requires a showing of "culpability" the main opinion translates that term into "knowing or reckless failure" to ascertain and disclose those facts as to which the person sued has a "duty of disclosure." With respect to the nature and extent of this duty, we are provided with uncertain and apparently conflicting guidelines. Although the duty is described as one which requires the corporate officer to "act reasonably in discovering facts material to the [exchange] offer," *ante* at 369, that statement is promptly qualified by observations to the effect that "corporate officers have a reasonable area of discretion in determining how far to explore the facts and in deciding what facts need to be dis-

closed," *id.*, and that they must be allowed "considerable room" *for such discretion, supra*, n. 22. With these latter comments I must respectfully disagree. In my view the test of materiality which was adopted by this court in *List, Heit* and *Texas Gulf Sulphur*, remains an objective one. If the corporate officer has knowledge of facts that are material according to that test, he cannot in his discretion decide not to disclose them without facing liability under § 14(e).

### Reliance

On the subject of what proof of reliance is required to establish causation, the Supreme Court has spoken definitively in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and in its sequel, Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In *Mills* minority shareholders of Electric Auto-Lite brought a derivative and representative class action challenging that company's merger with Mergenthaler Linotype Company on the ground that stockholders' approval had been obtained by means of a materially misleading proxy statement in violation of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a–9. The alleged omission was the failure of defendants, who controlled 54% of Auto-Lite's voting shares and needed a two-thirds majority for approval of the merger, to disclose that they were nominees of Mergenthaler. The district court's award of summary judgment to the plaintiffs was reversed by the Court of Appeals on the ground that causation had not been established. The Supreme Court, in a characteristically lucid opinion by Justice Harlan, who spoke for a unanimous court, reversed the Court of Appeals, holding that where the "proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction," 396 U.S. at 385, 90 S.Ct. at 622, proof of actual reliance on the material misstatement or omission need not be adduced. This principle was later summarized by Justice Blackmun in *Affiliated Ute Citizens, supra*, as follows:

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384 [90 S.Ct. 616, 621, 24 L.Ed.2d 593] (1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (CA2 1968), cert. denied *sub nom.* Coates v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed. 2d 756] (1969); 6 L.Loss, Securities Regulation 3876–3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud—SEC Rule 10b–5, §§ 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. Chasins v. Smith, Barney & Co., 438 F.2d [1167] at 1172." 406 U.S. at 153–154, 92 S.Ct. at 1472.

In short, whatever may have been our earlier views as to the necessity of adducing positive proof of reliance, see, e. g., Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U. S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), the gravamen of the offense is now the material misrepresentation itself, from which reliance by a reasonable investor may be inferred as a matter of law, thus rendering unnecessary proof of actual subjective reliance. The rational behind this doctrine is that it "will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions." 396 U.S. at 385, 90 S.Ct. at 622.

The main opinion, following the lead of Judge Adams in Kohn v. American

Metal Climax Inc., 458 F.2d 255, 290 (3d Cir. 1972), construes *Mills-Ute* as creating a *"presumption"* of reasonable reliance "where it is logical to presume that reliance in fact existed." I disagree with this interpretation of the Supreme Court's decisions on the subject. At no point did that Court expressly or impliedly speak in terms of a "presumption." Use of that term naturally raises further questions: Is the presumption to be conclusive or rebuttable? If rebuttable, should not BPC be given an opportunity in the present case to rebut the presumption by offering proof that the percentage of Piper shareholders who did not rely upon its alleged misrepresentations in tendering their shares was sufficient to enable BPC to achieve control? See Note, Causation and Liability in Private Actions for Proxy Violations, 80 Yale L.J. 107, 135–38 (1970).

In my view, unless reasonable reliance is found as a matter of law on the basis of the material misrepresentation, the Supreme Court's purpose in *Mills-Ute,* which was to avoid the impracticalities of determining how many votes or decisions to tender were affected, would be undermined. The door would still be open to extensive discovery and protracted proceedings aimed at establishing subjective non-reliance. The Supreme Court's decision not to remand for introduction of such proof in *Mills* or *Ute* indicates that it established a rule of law rather than a "presumption." Moreover, *Ute,* which involved 10b–5 claims, refutes the distinction relied on by Judge Adams in *Kohn, supra,* 458 F.2d at 289, that different standards of reliance and causation may be applicable to claims under § 14(a) as opposed to those under § 10(b).

In the present case BPC needed all but approximately 1% of the 7% gained as a result of its exchange offer in order to achieve its 51% control. Proof of non-reliance by all but 1% of the tendering Piper shareholders would be most unlikely. However, the main opinion, *ante* at 373, by obligating CCI to "show that there was a misrepresentation upon which the target corporation stockholders relied and that this was in fact the cause of CCI's injury" and by stating repeatedly that reliance will be "presumed," virtually invites an application for rehearing and remand to try the issue of reliance. I would clarify that issue now.

For these reasons my concurrence is based simply upon the view that, according to the principles established by the Supreme Court in *Mills* and *Ute,* CCI has established reliance as a matter of law in the present case.

*BPC's Violations of Rule 10b–6 of the 1934 Act*

In its denial of preliminary injunctive relief this court held that BPC's cash purchases of 120,200 Piper shares violated Rule 10b–6. Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 576–577 (2d Cir. 1970) (en banc). We there found Rule 10b–6 applicable to purchases of a target corporation's shares since such purchases might have a bullish radiating effect upon a pending exchange offer.

I concur in the view that since BPC's unlawful purchases of Piper shares enabled it to gain control of Piper, its conduct is actionable at the instance of CCI, which was thereby handicapped in its lawful competition for control. However, I cannot agree with the main opinion's view that BPC's purchases actually "operated in the market to make BPC's exchange offer deceptively attractive." There was no such proof. Nor do I accept the view that liability should be predicated upon the *"presumption"* that "Piper shareholders . . . were deceived" or that the "illegal purchases will substantially inflate" the price of the exchange offer. Unless the presumption were conclusive, BPC would be entitled to rebut it by offering proof that its cash purchases did not have any radiating effect upon the exchange offer.

For these reasons my concurrence is based solely on the ground that where a

party acquires control of a target corporation through violation of applicable provisions of the securities acts and regulations promulgated thereunder (in this case Rule 10b–6), it is liable as a matter of law to a competitor for any damages caused by the illegal conduct.

### The Piper Family Defendants

I concur in the conclusion that the Piper family defendants did not become liable to CCI by virtue of their participation in the May 8th press release announcing the BPC exchange offer. The statement of predicted value contained in the release was not a material representation since the specific terms were contained in the registration statement filed shortly thereafter and the actual value of the package appeared as soon as the exchange offer became effective. I therefore find it unnecessary to decide whether a reasonable investor would have construed the $80 promised value to refer to market price of the security or to an appraisal of BPC's assets and earnings, or whether the archetypical investor should have been expected to make this differentiation from the bare words of the press release.

I also concur in the majority view that CCI has not proved its claim based upon the letters sent by the Piper family to Piper shareholders in June and July, 1969. Although these letters failed to mention the arrangement with BPC whereby the Piper family might gain a huge profit if BPC succeeded in acquiring control of the Piper Company, CCI promptly furnished the essential information to all Piper stockholders on June 16, 1969, before the BPC tender offer became effective. In view of the latter communication no reasonable investor would have accepted BPC's tender offer, which went into effect on July 18, 1969, in reliance upon the Piper family letters.

I must dissent, however, from the majority's failure to accord similar treatment to the claim based on the earlier letters written by the Piper family to Piper stockholders on January 27 and 28, 1969, and to the January 29 press release. I agree that these letters and press release were materially misleading and that a reasonable investor would have considered them important in deciding whether to accept or reject CCI's cash tender offer. Under the *Mills-Ute* test positive proof of reliance was unnecessary to establish causation. However, proof of damages is a separate question and requires more. As the Supreme Court stated in Mills v. Electric Auto-Lite, *supra*, 396 U.S. at 388–389, 90 S.Ct. at 624:

> "On the other hand, where, as here, the misleading aspect of the solicitation did not relate to terms of the merger, monetary relief might be afforded to the shareholders only if the merger resulted in a reduction of the earnings or earnings potential of their holdings. In short, *damages should be recoverable only to the extent that they can be shown.*" (Emphasis supplied)

Applying this principle, CCI must show that it suffered some resulting loss. This it has failed to do. In making the January cash tender offer it agreed to purchase up to 300,000 Piper shares if tendered by February 3, 1969, and the district court found that it was not seeking more. 304,606 shares were tendered and purchased by CCI. Thus CCI exceeded its goal. It got more shares than it agreed to buy. No loss was suffered. Indeed it publicly stated that the cash tender offer had been a success.

Although CCI reserved the right to purchase more than 300,000 shares, it did not have sufficient funds to purchase any significant amount in excess of 300,000. Nor had "financing for . . . shares in excess of 300,000 . . . been arranged. . . ." (Testimony of C. Leonard Gordon, CCI's Vice-President and General Counsel). It is true that Mr. Gordon testified that Burnham & Co. would have provided additional financing if more than 300,000 shares had been tendered. However, the record shows conclusively that CCI's

chances of obtaining such a loan were negligible, due to a restrictive agreement in effect with its senior noteholders and the prohibitive cost of borrowing additional funds.

Under its agreement with its senior noteholders CCI had obligated itself not to have any unsecured current debt for bank loans in excess of a $15,000,000 revolving line of credit already obtained from the Philadelphia National Bank. The parties have stipulated that on February 3, 1969, the entire proceeds of this $15 million loan were received by CCI and used by it to pay for Piper shares received by it on its January 24, 1969, cash tender offer, which closed on the same date the loan proceeds were received. (App. 825A). By February 4, 1969, CCI had purchased 540,000 shares of Piper stock at a cost in excess of $30,000,000. Its cash resources were virtually exhausted. Yet it did not seek waivers from its senior noteholders to permit additional borrowing. Indeed, the parties have further stipulated that no resolution authorizing CCI to borrow money or obtain credit from any other source to purchase Piper stock was ever sought or adopted. (App. 284A).

The reason for CCI's failure to seek additional loans was made clear by testimony of Mr. Woudhuysen, a partner of Burnham & Co., that the borrowing terms would have involved an 8¾% interest rate plus the issuance of 22,500 CCI warrants, exercisable at the market price of CCI common stock, for each million dollars borrowed on a two-year loan. Thus if CCI should borrow $20 million on such a two-year loan the total cost of the money, calculated according to a commonly accepted formula, would have been a staggering 43.11%!

In summary, having "shot its bolt" in the financial sense by early February 1969 CCI was thereafter relegated in its quest for control of Piper to the use of exchange offers. It was in no position to purchase for cash any appreciable amount of Piper shares over and above the 304,606 tendered in response to its initial cash offer. Indeed, although additional Piper shares were available in the market after the expiration date of CCI's tender offer, some at less than $65 per share,[3] CCI purchased only 9,100 shares between February 3, 1969, and April 7, 1969, when the SEC advised it that such cash purchases during the pendency of its exchange offer (for which it had filed its Form S-1 with the Commission on February 27, 1969, to become effective May 15, 1969) would violate Rule 10b-6. The record further reveals that although Herbert Siegel, Chairman of the Board of CCI, knew as early as February, 1969, that Cornfeld's Fund of Funds Proprietary Fund, Inc. owned a large block of 78,600 Piper shares (later purchased by BPC), CCI made no effort to purchase it. Nor can CCI's lack of pursuit of the substantial Cornfeld block be attributed to a hypothesized desire to avoid the expense of searching out and purchasing small blocks of shares, as the main opinion suggests.

By March 19, 1969, when the Grumman deal collapsed, any possible effect of the Piper family's January 29, 1969, Grumman press release was completely dissipated, and by April 7, 1969, when the SEC took the position that further cash purchases were prohibited by Rule 10b-6, CCI could no longer claim that the January letters inhibited its purchase of Piper shares. By May 8, 1969, when BPC announced its tender package valued at $80, CCI could no longer contend that the Piper family's statement that Piper shares were worth more than $65 per share was misleading. Nor is the main opinion's fanciful assumption that the January letters "undoubtedly . . . influenced" Piper shareholders against accepting CCI's later *exchange* offer by casting a general pall of unfair-

---

3. The Piper family January letters and press release regarding the Grumman transaction did not cause an increase in the market price of Piper shares. On the contrary the price declined from 64¼ per share on January 28 to 59⅝ on February 3.

ness over CCI's reputation anything more than rank speculation.

Dogged by its inability to obtain financing that would have enabled it to purchase available Piper stock for cash in competition with BPC, CCI's efforts to obtain control by the cash offer route were doomed to failure. By the close of its second exchange offer on August 4, 1969, CCI owned 41% of Piper's outstanding shares as compared with 45% owned by BPC. Thereafter it was BPC's cash purchases in the open market of 100,614 shares, as compared with CCI's capacity to buy only 29,200 shares, that won control for BPC.

Thus there has been a complete failure to show that the Piper family's January letters and press release, which form the sole basis for the majority's decision holding liable the Piper family defendants, caused any damage to CCI. The record is clear that the Piper communications, unlike the misleading statements in BPC's exchange offer or BPC's cash purchases in violation of Rule 10b–6, did not deprive CCI of a fair opportunity to compete in the contest for control or enable BPC to win that contest.

In short, since the record shows that CCI did not suffer any damages as a result of the Piper family's communications, I would affirm the dismissal of CCI's claim against the members of that family.

### First Boston and its Officers

Where an underwriter participates in an exchange offering by assisting in the preparation of the registration statement and prospectus and by lending its name to the offer, I agree that § 14(e) should be construed to impose upon him the same obligation as that imposed upon the issuer with respect to materially false or misleading statements or omissions, and that a damage suit should lie against the underwriter in favor of the competing bidder for control who suffered resulting damage. This conclusion is based solely upon the principle of implying liability as a means of promoting private enforcement of the antifraud provisions of the securities laws. See p. 396, *supra*. However, unlike the main opinion on this issue, I gain no assistance in reaching that decision from § 11(b) of the 1933 Act, 15 U.S.C. § 77k(b) or from the Senate Report accompanying § 14(e), S.Rep.No. 510, 90th Cong., 2d Sess. (1968), U.S. Code Cong. & Admin.News 1968, p. 2811.

Since § 11(b) *expressly* creates liability for materially misleading statements in a prospectus and then only in favor of purchasers of the security, I fail to find it of any help in *implying* liability under § 14(e) in favor of nonpurchasers. Indeed it could be argued that the very fact that Congress expressly delineated the scope of liability in § 11(b) militates against implying liability in § 14(e). As for the Senate Report accompanying § 14(e), I believe the authors would be startled to find that they had in mind underwriters such as First Boston Corp. when they referred generally to persons "engaged in making . . . tender offers or otherwise seeking to influence" the decision of investors with respect to such offers.

### Injunctive Relief

I concur in the well-reasoned opinion of Judge Gurfein affirming the district court's denial of injunctive relief against violation by BPC of the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. 331 F.Supp. 1154.

The dissent's description of BPC's conduct as "most flagrant," its characterization of the district court's action as an "abuse of discretion," and its portrayal of our decision as a "mischievous precedent," simply ignore undisputed contrary findings of fact, which are fully supported by more than ample credible evidence. Such comments sacrifice controlling evidence and governing legal principles to insatiable zeal for use of an unjustified remedy, all in the name of

vigorous enforcement of federal securities laws.

A review of the claims, evidence and findings demonstrates the wisdom of allowing Judge Pollack's decision denying injunctive relief to stand. The Commission's claim was that BPC's registration statement and prospectus were materially deficient because of an alleged failure to disclose that it had decided to sell BAR at a price some $13.4 million below the figure at which it was carried on BPC's financial statements, and that BPC deliberately deferred the closing of the sale until its exchange offer was completed in order to avoid making the writedown that would be required if the sale were completed prior to or during the pendency of the offer. After receiving extensive proof on these issues, including the testimony of key witnesses who were personally observed and whose credibility was appraised by Judge Pollack, whose experience in the field of securities litigation at least matches if not exceeds that of this panel, he found that during the period when BPC's registration statement and prospectus were in effect (i.e., from July 18, 1969 to August 27, 1969) no decision to sell had been made.[4] However he further found that although there was no intent to mislead on the part of BPC in carrying BAR at $18.4 million on the balance sheet, that figure was obsolete to the point of being misleading and should have been qualified by reference to pending negotiations for sale at a substantially lower figure.[5] These crucial findings, supported by substantial evidence, cannot be rejected by us.

"Our court is not disposed to overturn conclusions of the trier of facts which are based upon substantial evidence and upon a determination of the credibility of witnesses who have given conflicting versions of the facts. N.L.R.B. v. Chain Service Restaurant Employees, 302 F.2d 167, 171 (2 Cir. 1962); Wilson v. United States, 229 F.2d 277, 279 (2 Cir. 1956); Phelan v. Middle States Oil Corp., 220 F.2d 593, 598 (2 Cir.), cert. denied sub nom. Cohen v. Glass, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260 (1955). Moreover, where a trial has been had by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' Fed.R.Civ.P. 52(a), 28 U.S. C." Heyman v. AR. Winarick, Inc., 325 F.2d 584, 589 (2d Cir. 1963).

The dissent reluctantly concedes that the foregoing findings are supported by substantial evidence and confirms, in accordance with our decision in SEC v. Manor Nursing Centers, Inc., 458 F.2d

---

4. "The Court has found that as of these dates Bangor Punta had not reached a decision to sell. The Commission's charge that the sale was a reasonable probability is made from the vantage point of hindsight. In the total perspective of events preceding the sale—including the last-minute attempts to convert it into a sale of assets—the Court cannot find that the sale was a reasonable probability at the time and to the people involved." (331 F.Supp. at 1160–1161).

5. "The essential question is whether, despite the non-existence of intent or of reasonable probability, the circumstances surrounding the sale were such as to indicate that the $18.4 million carrying figure of the BAR holding was obsolete to the point of being misleading. The Court finds that it was— absent full disclosure of the factors affecting the ultimate decision to sell the BAR interest at a figure of $5 million—or even $7 million—and regardless of whether the sale was to be of stock or of assets.

\* \* \* \* \*

"I find that Bangor Punta did not intentionally or purposefully mislead Piper Aircraft stockholders or the investing public by the omission to make disclosure of the sale under consideration nor did Bangor Punta or its directors intend to gain an advantage over Chris-Craft by the nondisclosure in the contest being waged for control of Piper. There was no purposeful connection between the nondisclosure and the contest for control. In other words, the nondisclosure was not prompted by an improper purpose. However, absence of bad faith does not excuse the failure to include facts necessary to render the statements in the registration statement and prospectus not misleading." SEC v. Bangor Punta Corp., 331 F.Supp. 1154, 1161 (S.D.N.Y.1971).

1082, 1100 (2d Cir. 1972), that in deciding whether to grant the extraordinary remedy of injunctive relief the district judge is vested with "broad discretion," which may be set aside only upon a clear showing of abuse of discretion. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); SEC v. Culpepper, 270 F.2d 241, 249–250 (2d Cir. 1959); SEC v. Torr, 87 F.2d 446 (2d Cir. 1937); SEC v. Okin, 139 F.2d 87, 88 (2d Cir. 1943); SEC v. Universal Service Ass'n, 106 F.2d 232 (7th Cir.), cert. denied, 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519 (1939); SEC v. Pearson, 426 F.2d 1339 (10th Cir. 1970). However the dissent seeks to avoid these time-honored basic principles by suggesting that we may invoke a less stringent standard of review when the appeal is from *denial* of injunctive relief rather than from *grant* of such relief, relying upon NMU v. Commerce Tankers Corp., 457 F.2d 1127 (2d Cir. 1972), which dealt with relief against unfair labor practices. That case is clearly distinguishable and has no application here. There we expressly noted that in deciding whether injunctive relief pending final adjudication by the NLRB in unfair labor practice cases is appropriate under 29 U.S.C. § 160(*l*), "the role of the district court . . . is not to determine whether there has in fact been a violation of the Act but rather to determine whether the Regional Director could have *reasonable cause to believe* that the unfair labor practice charged had been committed and that its continuation ought to be enjoined." *Id.* at 1133 (emphasis in original). No such considerations control here, where a showing must be made that the person charged "is engaged or about to engage in any acts or practices which constitute or will constitute a violation," 15 U.S.C. §§ 77t(b), 78u(e).

We have found no instance where the standard for review of unfair labor practice suits has been applied to a suit by the SEC. On the contrary, in affirming the denial of injunctive relief in a suit by the SEC, the Tenth Circuit has taken the opposite view:

"We are obliged to give great weight to the supported findings including the trial court's conviction that appellee did not intend further participation in the stock brokerage business in which he had not engaged for over a year before the hearing. See S.E.C. v. Franklin Atlas Corporation, supra 171 F.Supp. at 718. While we are persuaded that certain findings were clearly erroneous, we cannot say that there is a showing of abuse of the trial court's discretion in denial of the preliminary injunction and affirm that ruling." SEC v. Pearson, 426 F. 2d 1339, 1344 (10th Cir. 1970).

With respect to the contention that Judge Pollack applied an erroneous standard in determining whether an injunction should issue, we would be engaging in petty semanticism if we were to reverse his decision because of his use of the words "propensity or natural inclination" instead of the phrase "reasonable likelihood that the wrong will be repeated." There is nothing magic about either phrase, as was recognized in SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1101 (2d Cir. 1972), where this court, referring to Judge Pollack's use in this very case of the terms "propensity or natural inclination to violate the securities laws," said: "In relying upon our decision in *Texas Gulf Sulphur*, which applied the reasonable likelihood standard, the district court demonstrated that it was not purporting to apply a new standard for the issuance of an injunction." I am not persuaded by the dissent's present attempt to explain away this earlier view of the standard adopted by Judge Pollack. Although there is a slight difference between the two clauses, both express substantially the fundamental condition precedent to the issuance of the extraordinary remedy of a permanent injunction, i.e., that there must be a showing of a cognizable risk of future violation, something "more than the mere possibility which serves to keep the case alive." United States v.

W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).[6]

Nor was injunctive relief denied merely because of lack of wrongful intent. Judge Pollack expressly recognized (supra n.5) that absence of bad faith or of an intent or purpose to violate the securities laws will not necessarily excuse the defendant and that an evil intent need not be shown to grant relief. But the lack of such intent is an important factor to be considered by the court in assessing the risk of future violations. One who intentionally violates the law or shows a willful disregard for it is usually a poorer risk than one who acts without a full appreciation for the seriousness of his conduct. In addition, however, the court must weigh all of those considerations which have been the traditional concern of the courts of equity, including the nature and extent of past violations, the effect on the public interest, and the impression on the trial judge made by the defendants who testified. SEC v. Harwyn Industries Corp., 326 F.Supp. 943, 955–958 (S.D.N.Y. 1971).

The $18.4 million ascribed to BAR as "stated book value" on BPC's financial statements was an obsolete and hence misleading figure in view of pending negotiations for sale of the railroad at a much lower price. Some caveat or reference to the negotiations was required. However, I cannot agree that BPC's failure to furnish additional data was "flagrant." This characterization ignores the fact that under generally accepted accounting principles "stated book value" may properly be used in a financial statement and is not viewed in the financial world as the equivalent of market value. A person able to read a balance sheet would probably have recognized that such "historical" cost did not necessarily represent current liquidating value. Furthermore, to write

down the figure immediately to $5 million might have been treated by the SEC as speculative and possibly misleading, in view of the other forms of disposition of BAR that were still under consideration.

The other alleged "past violation" chargeable against BPC—that its May 8, 1969 press release constituted an offer to sell before any registration statement had been filed—constituted at most a technical violation. BPC filed its registration statement and preliminary prospectus shortly after the May 8th release and in consenting to a permanent injunction it did not admit any of the allegations of the complaint filed against it in the District Court for the District of Columbia.

Nor can I agree that BPC should be singled out for special injunctive treatment because it is a conglomerate. There is no evidence to support the view that it has "long been interested in new acquisitions" or that it will "become involved in similar tender offers in the future." We are not concerned here with a corporate behemoth of the size of ITT but with a corporate venture of relatively modest size. Even if BPC should become interested in further lawful acquisitions for what it conceives to be sound economic reasons, the totality of the circumstances do not indicate any likelihood that it will engage in further violations of the securities acts.

Aside from the foregoing factors I am convinced that a judgment which (1) awards compensatory damages to CCI, (2) bars BPC from voting its illegally acquired Piper shares, and (3) awards rescission to former Piper stockholders who exchanged their shares in response to BPC's tender offer, amply protects the public interest and insures against any reasonable likelihood that BPC will engage in similar conduct in the future.

The relief granted is bitter medicine which will be far more effective than a

---

6. It appears to have been the SEC in its brief that first used the phrase adopted by Judge Pollack, "Because of this demonstrated propensity for violating the securities laws, the scope of the injunction against Bangor Punta should be broad,"

etc. Brief, p. 16, citing SEC v. Raffer, 1969–1970 CCH Fed.Sec.L.Rep. ¶ 92,632 (S.D.N.Y.1970). It was this standard put forward by the Commission to which Judge Pollack was evidently responding below. 331 F.Supp. at 1162–1163.

blanket injunction in deterring infraction of the law.

## ON PETITION FOR REHEARING

## CHRIS–CRAFT INDUSTRIES, INC. v. PIPER AIRCRAFT CORP., ET AL.

### (No. 72–1064)

Petitions for rehearing having been filed herein on March 30, 1973 on behalf of appellees Howard Piper, Thomas F. Piper and William T. Piper, Jr.; on behalf of appellees Bangor Punta Corporation, Nicolas M. Salgo and David W. Wallace; and on behalf of appellees The First Boston Corporation, Paul L. Miller and Nicholas H. Bayard; and

Due consideration by the undersigned members of the panel having been given to said petitions for rehearing; it is therefore

ORDERED as follows:

(1) That, with respect to the petition for rehearing on behalf of appellees Paul L. Miller and Nicholas H. Bayard, the said petition is granted to the extent that the main opinion filed herein on March 16, 1973 is amended by adding the following sentence at the end of the first paragraph concluding on p. 380, *supra*:

"In view of the voluminous record, upon remand, the district court shall determine from the record whether, under the principles of liability regarding First Boston and its officers in this opinion, Paul L. Miller and Nicholas H. Bayard, or either of them, is individually liable."

(2) That in all other respects the said petitions for rehearing are denied.

> WALTER R. MANSFIELD
> United States Circuit Judge
> WILLIAM H. TIMBERS
> United States Circuit Judge
> MURRAY I. GURFEIN
> United States District Judge

\* On August 15, 1973, the Solicitor General of the United States, on behalf of the SEC, filed a petition for a writ of certiorari in SEC v. Bangor Punta Corp. (No. 72–

## ON PETITION FOR REHEARING EN BANC

## CHRIS–CRAFT INDUSTRIES, INC. v. PIPER AIRCRAFT CORP., ET AL.

### (No. 72–1064)

Petitions for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the appellees, and no active circuit judge having requested that a vote be taken on said suggestion,

Upon consideration thereof, it is

Ordered that said petitions be and they hereby are denied.

## ON PETITION FOR REHEARING

## SEC v. BANGOR PUNTA CORP.
### (No. 72–1053)

A petition for a rehearing having been filed herein by counsel for the appellant,

Upon consideration thereof, it is

Ordered that said petition be and it hereby is denied.

TIMBERS, Circuit Judge:
I dissent.

## ON PETITION FOR REHEARING EN BANC

## SEC v. BANGOR PUNTA CORP.
### (No. 72–1053)

A petition for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the appellant, a poll of the judges in regular active service having been taken at the request of such a judge, and there being no majority in favor thereof,

Upon consideration thereof, it is

Ordered that said petition be and it hereby is denied.

HAYS, OAKES and TIMBERS, Circuit Judges:
We dissent.\*

1053) to review the part of the judgment that affirmed denial of injunctive relief sought by the Commission.